

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---
### NO. PD-1341-13
---

**CORNELIOUS L. MATTHEWS, Appellant**

**v.**

**THE STATE OF TEXAS**

---
### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE EIGHTH COURT OF APPEALS
### TARRANT COUNTY
---

COCHRAN, J., delivered the opinion of the Court in which KELLER, P.J., and MEYERS, PRICE, WOMACK, JOHNSON, HERVEY and ALCALA, JJ., joined. KEASLER, J., concurred.

### O P I N I O N

Appellant was charged with possession with intent to deliver cocaine. He filed a pre-trial motion to suppress the crack cocaine that officers found during a warrantless search of a van that appellant had borrowed. After hearing the evidence, the trial judge ruled that appellant's original detention was reasonable and that he lacked standing to challenge the

search of the van.  A jury then found appellant guilty and sentenced him to twenty-two years in prison.  The court of appeals affirmed, agreeing that appellant lacked standing to challenge the van's search and upholding appellant's detention, even though it was based largely on information from an anonymous tip.[1]

We granted review to determine (1) whether a person who legitimately borrows a vehicle has standing to challenge its search, and (2) if appellant's initial and continued detention was supported by reasonable suspicion.[2]  We conclude that, although appellant originally had standing to challenge the search of the borrowed van, he abandoned any expectation of privacy (and hence his standing) when he fled from the officers and the van.  Second, the officers had reasonable suspicion to detain appellant that was not based solely on the anonymous tip, and appellant's act of fleeing increased their suspicion and further justified his continued detention to await the arrival of a drug dog.

## I.  Background

On July 23, 2009, at 11:11 p.m., Officer Zimpelman was dispatched to a food store on Hattie Street in Fort Worth to respond to an "anonymous" 911 call.  Although the tipster did not leave her name, Officer Zimpelman's "call screen" displayed the tipster's phone

---

[1] *Matthews v. State*, No. 08-11-00157-CR, 2013 WL 4517280, *3 (Tex. App–El Paso Aug. 23, 2013) (not designated for publication).

[2] Appellant's two grounds for review are:
1. Does a person have standing to contest an unlawful search where they are in possession of a vehicle with consent and permission of the vehicle's owner?
2. Can the police detain a person to conduct a warrantless search based on an anonymous tip when the initial investigation provides zero evidence to show any law violation?

number and address.  According to the caller, a black male named Neil Matthews, wearing a white muscle shirt and dark pants, was selling "crack" out of a white van parked in front of the store.  This was a high-crime area, known for drug and weapons arrests.

When Officer Zimpelman pulled up to the food store, he saw a white van in front of it.  He stopped behind the van, got out of his patrol car, and walked up to the passenger side window of the van, while his partner, Officer Smith, approached the driver's side.  Appellant was in the driver's seat of the van, wearing a white muscle shirt and dark pants.  He was just sitting there with the keys in the ignition and the engine off.

When Officer Zimpelman looked in the passenger window, he could see appellant's right hand, but appellant's left hand was hidden from view.  Concerned that appellant was hiding a weapon "because that area is known for pretty much a high crime rate area," Officer Zimpelman told appellant to show his other hand, but appellant ignored him.[3]  When Officer Zimpelman repeated his request, appellant said that he was showing his hands, even though his left hand remained hidden by the driver's side door.  Because it was close to midnight, difficult to see, and a high crime area, Officer Smith told appellant to get out of the van after he had repeatedly refused to show both his hands.  Officer Smith led appellant to the back of the van and frisked him.  Appellant was unarmed.  When Officer Zimpelman asked appellant for his name, he said, "Cornelious Matthews."

---

[3] Officer Zimpelman testified: "I told him to show me his hands. He glanced over at me, looked straight forward or straight ahead from where he was sitting toward the store, glanced back over at me."

Based on the details from the anonymous tip, the fact that appellant's name was very similar to "Neil Matthews" (the name provided by the tipster), and appellant's gestures, Officer Zimpelman asked for consent to search the van. Appellant refused, stating that the van was not his, so he could not allow the search.[4] Officer Zimpelman explained to appellant that "he was sitting in the driver's seat, so therefore he's in the care, custody, and control of the vehicle, that he can provide . . . permission." Appellant responded "I don't even have the keys." Officer Zimpelman reminded him that the keys were in the ignition, but appellant still did not consent to the search.

Officer Zimpelman called dispatch and requested a K-9 unit. When appellant heard that request, "[h]is body became more tense. His eyes got larger" and his breathing became "more rapid, kind of the fight or flight response." Officer Zimpelman told a third officer to put appellant in the back of the squad car for further investigation. But as the officers walked to the squad car, appellant took off running. Officer Zimpelman pursued appellant on foot for several blocks, finally caught him, and brought him back to the squad car. When they returned, the anonymous tipster was at the scene and identified herself as the caller. When officers discovered that she had outstanding warrants, they arrested her as well.

K-9 Officer Macy arrived with his dog, Hutch, and conducted an "open-air sniff" around the van. Hutch alerted, so the officers searched the van and found a package of

---

[4] At some point, Officer Zimpelman checked the vehicle registration and discovered that the van belonged to "Joaquin Cardona." After appellant was in custody, a Hispanic man approached the officers and said that he owned the van.

marijuana in the driver's-side door pocket and crack cocaine in a small compartment behind the driver's seat.[5]  The officers arrested appellant on drug charges.

Appellant filed a motion to suppress, but after hearing the testimony of Officer Zimpelman, Officer Macy, and appellant, the trial judge denied the motion.  The judge stated that appellant did not own or have any possessory interest in the van, and thus he did not have standing to challenge the search.[6]  A year later, right before the trial began, appellant

---

[5] Appellant testified at the first suppression hearing, and his version of events differed significantly from Officer Zimpelman's. Appellant said that he was waiting in the van for his "Auntie" to meet him, when two officers approached the van and told him to show his hands. Then, according to appellant,

> I showed him my hands. He asked for my ID, I gave him my ID. He told the other officer to keep an eye on me. And then he told me to step out [of] the car. So he ran to go check my name. And I didn't have no warrants. And then the other officer searched me and they didn't find nothing. And then I told him why was they messing with me. And my auntie came around the corner and she asked them why was they messing with me because she was about to take me home.

Appellant said that he refused to consent to the search of the van because it did not belong to him. But appellant claimed that he did not run away until a drug dog arrived and failed to alert. He said that the officers continued to harass him, so he ran away. Appellant stated that, after Officer Zimpelman caught him and brought him back to the van, a second drug dog circled the van and also failed to alert.

When reviewing the ruling on a motion to suppress, we view the evidence in the light most favorable to the trial judge's ruling. *Wade v. State*, 422 S.W.3d 661, 666 (Tex. Crim. App. 2013). "The prevailing party is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it." *Id.* at 666-67.  Thus, to the extent that they conflict, we accept Officer Zimpelman's version of the events, not appellant's.

[6] The trial judge explained:

> This is a situation where [appellant] from the very beginning denied ownership or an ownership interest in the vehicle involved. His reason for denying the officers the consent to search the vehicle was based upon the fact that it was not his vehicle, that he did not know what was in it, his assertion that he had no possession or ownership of the vehicle is apparent.
>
> It's also a situation where the vehicle is actually registered to another person who–and that person apparently appeared upon the scene and claimed ownership of the vehicle. So the Court is addressing the issue of standing [and] is going to

filed another motion to suppress that challenged his original detention while also rearguing the standing issue.  After hearing testimony from the same witnesses, the trial judge ruled that appellant had standing to challenge the detention and search of his person, but that the detention and search were reasonable under the circumstances.[7]  He again concluded that appellant lacked standing to challenge the search of the van.

The court of appeals agreed that appellant did not have standing to challenge the search of the van.[8]  Because appellant did not have complete dominion and control over the van and because the "owner's grant of permission to Appellant to be in the vehicle does not rise to a claim of privacy consistent with historical notions of privacy[,]" he did not have a reasonable expectation of privacy in the van.[9]

---

determine from the facts this is a situation where [appellant] has no standing to complain about the search of the vehicle based on the circumstances in this case.

[7] In ruling that appellant's detention was reasonable, the trial judge found:
[T]he encounter with [appellant] was legitimate and reasonable under these circumstances. While initially the anonymous . . . caller . . . probably did not realize that her phone number or address was being revealed as she made the call, potentially. Although she might not have realized that, that's certainly not a surprise with modern technology.

And the fact that she later showed up indicates a willingness to be helpful and available for follow-up investigation. So I do think it's important that she did show up and indicate her willingness to participate further in this matter.  But the Court is going to find that the encounter was legitimate, that immediately the officers were able to confirm the details of the call. The Court is also going to find that under the circumstances, the *Terry* frisk of the defendant was reasonable under all the circumstances. The Court will also find that a brief period of detention following that is reasonable under the circumstances.

[8] *Matthews*, 2013 WL 4517280 at *3.

[9] *Id.*

The court of appeals also held that appellant's detention was supported by reasonable suspicion.[10]  When the officers arrived at the food store, they were able to corroborate some of the tipster's story–a man wearing the described clothing was sitting in the described vehicle.[11]  In addition, the officers knew that the location was a "high-crime, high-drug area."[12]  After they approached the windows of the van, appellant refused to comply with instructions to show both of his hands.[13]  Although a *Terry* frisk did not uncover any drugs or weapons, "the other facts known to the officers by personal observation increased the indicia of reliability of the anonymous tip."[14]  The court of appeals held that the entire investigative detention was lawful.[15]  We granted review of both of those holdings.

## II.  Reasonable Suspicion for the Investigative Detention

In his second ground for review, appellant argues that his continued detention after the *Terry* frisk was unlawful because it was not supported by reasonable suspicion; it was supported only by the 911 call of an anonymous tipster.  Appellant now purports to concede that the officers' original approach, request for him to get out of the van, and the pat-down search were permissible.  He argues that "the Constitutional line was crossed" when officers

---

[10] *Id*. at *4.

[11] *Id.* at *6.

[12] *Id.*

[13] *Id*.

[14] *Id.*

[15] *Id.*

wanted him to sit in the patrol car and wait for approximately fifteen to twenty-five minutes

for a drug dog to arrive, rather than release him when they did not find anything illegal

during the *Terry* frisk or initial investigation.[16] Appellant nevertheless continues, within his

brief, to challenge the propriety of the initial detention. We therefore address the

constitutionality of the detention from its inception.

## A.    Legal Principles

Under the Fourth Amendment, a brief investigatory detention must be justified by

reasonable suspicion.[17] "A police officer has reasonable suspicion to detain if he has

specific, articulable facts that, combined with rational inferences from those facts, would lead

him reasonably to conclude that the person detained is, has been, or soon will be engaged in

criminal activity."[18] In determining whether an officer has reasonable suspicion to detain,

we look at the totality of the circumstances through an objective lens, disregarding the

officer's subjective intent.[19] Although some circumstances may seem innocent in isolation,

they will support an investigatory detention if their combination leads to a reasonable

---

[16] Appellant's Brief at 9.

[17] *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011); *Bobo v. State*, 843 S.W.2d 572, 574 (Tex. Crim. App. 1992) ("Circumstances short of probable cause for an arrest may justify a temporary investigation or detention because investigation is a lesser intrusion on personal security than an arrest.") (internal quotation marks omitted).

[18] *Derichsweiler*, 348 S.W.3d at 914 (citing *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)).

[19] *Id*.

conclusion that criminal activity is afoot.[20]

An anonymous tip alone is seldom sufficient to establish reasonable suspicion.[21] Reasonable suspicion is dependant not only on the content of the information possessed by law enforcement, but also on its reliability.[22] To support reasonable suspicion, an anonymous tip requires some indicia that the caller is credible or that his information is reliable.[23]

Reasonable suspicion is not a carte blanche for a prolonged detention and investigation. The investigatory detention must be "reasonably related in scope to the circumstances which justified the interference in the first place."[24] An officer must act to confirm or dispel his suspicions quickly.[25] But the temporary detention may continue for a reasonable period of time until the officers have confirmed or dispelled their original suspicion of criminal activity.[26] One reasonable method of confirming or dispelling the

---

[20] *Id.*

[21] *Alabama v. White*, 496 U.S. 325, 329 (1990); *Florida v. J.L.*, 529 U.S. 266, 270 (2000); *but see Navarette v. California*, 572 U.S. __, 134 S.Ct. 1683 (2014) (concluding that an anonymous 911 tip was sufficiently reliable to support reasonable suspicion to make a DWI traffic stop).

[22] *White*, 496 U.S. at 330.

[23] *White*, 496 U.S. at 329; *Illinois v. Gates*, 462 U.S. 213, 230 (1983) ("[A]n informant's 'veracity,' 'reliability,' and 'basis of knowledge' are all highly relevant in determining the value of his report.").

[24] *Davis v. State*, 947 S.W.2d 240, 242 (Tex. Crim. App. 1997).

[25] *Parker v. State*, 297 S.W.3d 803, 810 (Tex. App.–Eastland 2009, pet. ref'd).

[26] *Davis*, 947 S.W.2d at 245 ("The propriety of the stop's duration is judged by assessing whether the police diligently pursued a means of investigation that was likely to dispel or confirm their suspicions quickly.") (internal quotation marks omitted); *see United States v. Sharpe*, 470 U.S. 675, 686-88 (1985) (police officer's temporary detention of motorist for 20 minutes was lawful in

reasonable suspicion that a vehicle contains drugs is to have a trained drug dog perform an "open air" search by walking around the car. If the dog alerts, the presence of drugs is confirmed, and police may make a warrantless search.[27] If the drug dog does not alert, the officer's suspicions will normally be dispelled, and the citizen may go on his way.[28]

## B.     Appellant's Detention Was Reasonable

Appellant was seized, and the investigatory detention began, when he was ordered to get out of the van and was frisked for weapons. However, contrary to appellant's claims, his detention was not based solely on the word of an unreliable anonymous tipster. Rather, the totality of the circumstances established reasonable suspicion to support the scope and duration of the officers' investigatory detention.

Officer Zimpelman responded to an "anonymous" tip alleging that appellant was selling crack from a white van outside the food store. In addition to the description and location of the van, the tip not only contained a detailed description of appellant, but also

---

its scope and duration because he pursued his investigation in a diligent and reasonable manner).

[27] *See, e.g., United States v. Cervine*, 347 F.3d 865, 872-73 (10th Cir. 2003) (officers who legitimately made traffic stop could detain driver for 30 to 50 minutes for arrival of drug dog based on reasonable suspicion that driver was transporting illegal narcotics); *United States v. Burton*, 288 F.3d 91, 101-02 (3d Cir. 2002) (officers who had reasonable suspicion to detain defendant did not exceed the time and scope of the detention when they called and waited for 30-45 minutes for a trained drug dog to conduct a drug sniff of the car); *see generally, Florida v. Harris*, 568 U.S. __, 133 S.Ct. 1050 (2013) (discussing procedure for "free air" drug-dog sniffs outside of a car).

[28] Of course, if officers otherwise have probable cause to search, a drug-dog's failure to alert on a car does not destroy that probable cause. *See United States v. Jodoin,* 672 F.2d 232, 236 (1st Cir. 1982) ("The dog's failure to react does not . . . destroy the 'probable cause' that would otherwise exist.").

identified him by name.  While the specificity of this tip contains indicia of reliability,[29] we need not decide whether this tip alone supported reasonable suspicion because Officer Zimpelman had additional facts before making his investigatory detention.

After Officer Zimpelman received the dispatch call at 11:11 p.m., he confirmed that the described van contained the described man at the described location, a high-crime area known for drug and weapons violations.  When he approached the passenger-side window of the van, he saw appellant concealing his left hand near the driver's side door.[30]  Fearing that appellant was holding a weapon, Officer Zimpelman asked appellant to show both of his hands.  Appellant did not comply; rather, he glanced at Officer Zimpelman but ignored his request.  When Officer Zimpelman repeated his request to see appellant's left hand, appellant responded that "he was showing . . . his hands."  Officer Smith, standing near the driver's side door of the van, told appellant to exit the van.  Appellant complied and followed Officer

---

[29] Recently, in *Navarette v. California*, the Supreme Court held that an anonymous tip contained adequate indicia of reliability to support reasonable suspicion because the content of the tip indicated that it was based on eyewitness knowledge, was contemporaneously made, and was made to the 911 emergency system, which "has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." 572 U.S. ___, 134 S. Ct. 1683, 1691-92 (2014).

Similarly, in this case the tipster called 911, and Officer Zimpelman's "call sheet" displayed the phone number and address associated with the call. However, the call sheet does not indicate who made the 911 call from that address or whether the caller knew that her number could be traced. Nor does access to such "call sheet" information necessarily increase the likelihood that a tip is reliable. *See Navarette*, 134 S. Ct. at 1694 (Scalia, J., dissenting) ("But assuming the Court is right about the ease of identifying 911 callers, it proves absolutely nothing in the present case unless the anonymous caller was *aware* of that fact. 'It is the tipster's *belief* in anonymity, not its *reality*, that will control his behavior.' There is no reason to believe that your average anonymous 911 tipster is aware that 911 callers are readily identifiable.") (citation omitted).

[30] The driver's side door pocket was where the bag of marijuana was later found.

Smith to the back of the van, where Officer Smith made a *Terry* frisk.

This investigatory detention was not based solely on the anonymous 911 call.[31]  In

addition to the tip,

- Officers discovered appellant in a high-crime area, known for drug and weapons offenses, late at night;

- He was dressed as the 911 caller had described and was named as the 911 caller had said;

- He was sitting in the driver's seat of the van that the 911 caller had described with the key in the ignition, but the engine off.  He was just sitting there;[32]

- Appellant refused to comply with the officers' request to show both of his hands, and he did so in a suspicious manner.

When coupled with the specific anonymous tip that appellant was selling "crack" from

that van, the totality of circumstances established reasonable suspicion to briefly detain and

investigate the officers' suspicions.[33]  With their suspicions aroused, officers requested that

appellant exit the vehicle, and they performed a pat-down search.  The pat-down did not

---

[31] *Compare Florida v. J.L.*, 529 U.S. 266 (2000) (no reasonable suspicion when officer's suspicion was not raised by his own observations, but only by an anonymous tip that a young black male wearing a plaid shirt was carrying a gun), *with Navarette v. California*, 572 U.S. __, 134 S.Ct. 1683, 1688-89 (2014) (distinguishing *J.L.* and concluding that anonymous 911 caller in this case must have had personal knowledge of reckless driving and that the caller included predictions of future behavior, thereby pedigreeing reliability of tip).

[32] Although this behavior is certainly consistent with legal conduct, it is also consistent with a drug dealer selling crack cocaine out of his vehicle.

[33] *Cf. Wade v. State*, 422 S.W.3d 661 (Tex. Crim. App. 2013) (no reasonable suspicion based on nervousness and refusal to cooperate during consensual encounter with law enforcement). In the present case, there were additional suspicious factors that were not present in *Wade*: Officers received an anonymous tip describing specific criminal activity by a specifically named and dressed person in a high-crime area late at night.

reveal any contraband or weapons. Appellant argues, "It was at this point where the Constitutional line was crossed," because instead of being released, Officer Zimpelman radioed for a K-9 unit and asked Officer Rodriguez to take appellant to the patrol car.[34] As appellant notes, "The testimony presented at the hearing established that [the wait for the K-9 unit] was expected to take between fifteen to twenty-five minutes."[35]

The post-frisk detention was not unreasonable, nor was it unnecessarily prolonged. Although the officers did not find any weapons or contraband during that frisk, the fact that appellant was not carrying a knife or a firearm did not address their suspicion that he was selling drugs from the van or that more drugs were in the van. To quickly confirm or dispel that suspicion, Officer Zimpelman called for a K-9 unit to make a walk-around search of the van. Although the wait for the K-9 unit was only expected to take 15 to 25 minutes,[36] appellant did not wait at all. He took off running. This two-block flight only increased the officers' suspicion that appellant was engaged in illegal activity.[37] Furthermore, this

---

[34] Appellant's Brief at 9.

[35] *Id.*

[36] *See Parker v. State*, 297 S.W.3d 803, 812 (Tex. App.–Eastland 2009, pet. ref'd) (officers acted diligently to confirm or dispel reasonable suspicion though the drug dog took 40 minutes to arrive after being requested); *Strauss v. State*, 121 S.W.3d 486, 492 (Tex. App.–Amarillo 2003, pet. ref'd) (A seventy-five-minute detention from the traffic stop until the drug dog arrived was not unreasonable.); *Josey v. State,* 981 S.W.2d 831, 840–41 (Tex. App.–Houston [14th Dist.] 1998, pet. ref'd) (A ninety-minute detention from the stop until a drug-dog alerted and the officers searched the car was not unreasonable.).

[37] *See Wade*, 422 S.W.3d at 674-5 n. 61 (noting that "a defendant's unprovoked flight from officers in an area of heavy narcotics trafficking supported reasonable suspicion that the defendant was involved in criminal activity and justified a stop in *Illinois v. Wardlow,* 528 U.S. 119 (2000)");

attempted flight constituted its own offense, evading arrest or detention.[38]

Officer Zimpelman caught appellant and returned him to the patrol car. By this time, the K-9 unit had arrived, and a dog alerted to the van. The officers searched the van and found marijuana and crack cocaine. At no point was appellant unlawfully detained.

### III.  Standing to Challenge the Search of the Van

In appellant's first ground for review, he argues that the court of appeals erred in holding that he lacked standing to challenge the search of the van. The rights protected by the Fourth Amendment to the U.S. Constitution and Article I, Section 9, of the Texas Constitution are personal.[39] As such, an accused must show that the search violated *his*, rather than a third party's, legitimate expectation of privacy.[40] He must show (1) that he exhibited an actual subjective expectation of privacy in the place invaded ("i.e., a genuine intention to preserve something as private")[41] and (2) that "society is prepared to recognize

---

*State v. Kerwick*, 393 S.W.3d 270, 276 (Tex. Crim. App. 2013) ("'[Flight] is not necessarily indicative of wrongdoing, but it is certainly suggestive of such' and may be considered among the totality of the circumstances in a reasonable-suspicion analysis.") (citation omitted).

[38] TEX. PENAL CODE § 38.04.

[39] *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978); *State v. Betts*, 397 S.W.3d 198, 203 (Tex. Crim. App. 2013).

[40] *Rakas*, 439 U.S. at 134; *Kothe v. State*, 152 S.W.3d 54, 59 (Tex. Crim. App. 2004) ("Proof of 'a reasonable expectation of privacy' is at the forefront of all Fourth Amendment claims. Any defendant seeking to suppress evidence obtained in violation of the Fourth Amendment must first show that he personally had a reasonable expectation of privacy that the government invaded. He must prove that he was a 'victim' of the unlawful search or seizure. He has no standing to complain about the invasion of someone else's personal rights.") (citations omitted).

[41] *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996).

that expectation of privacy as objectively reasonable."[42]

To determine whether a person's expectation of privacy is reasonable, we examine the

totality of circumstances surrounding the search,[43] guided by a non-exhaustive list of factors:

- whether the accused had a property or possessory interest in the place invaded;

- whether he was legitimately in the place invaded;

- whether he had complete dominion or control and the right to exclude others;

- whether, before the intrusion, he took normal precautions customarily taken by those seeking privacy;

- whether he put the place to some private use; and

- whether his claim of privacy is consistent with historical notions of privacy.[44]

Although we defer to the trial judge's factual findings, we review the legal issue of standing

de novo.[45]

## A.    Generally, a person driving a borrowed car has a subjective and reasonable expectation of privacy in that vehicle.

Normally, all six of the above factors indicate that a person who borrows a car with

the owner's permission has a reasonable expectation of privacy in that car.  Although a

---

[42] *State v. Betts*, 397 S.W.3d 198, 203 (Tex. Crim. App. 2013) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)); *Villarreal*, 935 S.W.2d at 138. "[T]he Court has consistently held that the defendant bears the burden of proving that he had a legitimate expectation of privacy in the premises searched." *Wilson v. State*, 692 S.W.2d 661, 667 (Tex. Crim. App. 1985) (op. on reh'g).

[43] *Betts*, 397 S.W.3d at 203.

[44] *Id*. at 203-04. *See also Villarreal*, 935 S.W.2d at 138; *Calloway v. State*, 743 S.W.2d 645, 651 (Tex. Crim. App. 1988).

[45] *Betts*, 397 S.W.3d at 204.

borrower may not have the full panoply of ownership, he has some property or possessory rights.[46]   And if his use of the car is authorized, it follows that his presence in the car is authorized.   Because he holds the keys to the car, he may control who enters it and who drives it, thus his dominion or control is superior to all others.[47]   Unless he flings open the doors or hands the keys to a mere passer-by, the borrower likely uses the normal precautions customarily taken by those seeking privacy in their cars.   And unless the borrower abandons the vehicle or converts it into a public bus, he likely puts the vehicle to private use.   Finally, privacy in a borrowed car is consistent with the historical notions of a bailee's privacy.[48]

This recognition of a reasonable expectation of privacy in a borrowed car is hardly novel.   Back in 1978, Professor LaFave wrote: "If the owner of a vehicle has turned it over to another person for some period of time, then surely this latter person has standing vis-a-vis the car during the duration of bailment."[49]   Relying on this language, we held that a defendant had standing to challenge the search of a parked car that he had borrowed.[50]   Several federal

---

[46] *See United States v. Jones*, 565 U.S. ___, 132 S. Ct. 945, 949 n.2 (2012) ("If Jones was not the owner he had at least the property rights of a bailee."); 8A AM. JUR. 2D, Bailments §§ 1-5, 8, pp. 520-25, 527-29 (2009) (definitions and types of bailments); *Id*. at § 51, p. 574 ("The bailee acquires only a possessory interest in the property, which carries with it such a legal interest in the subject matter as is consonant with the purposes of the bailment.").

[47] 8A AM. JUR. 2D, Bailments § 52, p. 575 (2009) ("In the absence of any contrary provision in the bailment agreement, the bailee has such control and dominion over the property as will allow the bailee to exclude all others from possession . . . .").

[48] *See infra*, notes 49-52

[49] 3 WAYNE LAFAVE, SEARCH AND SEIZURE, § 11.3 at 576-77 (1978).

[50] *Wilson v. State,* 692 S.W.2d 661, 670-71 (Tex. Crim. App. 1985) (op. on reh'g).

circuits recognized this privacy interest decades ago.[51]  And many Texas courts of appeals

have also properly found a reasonable expectation of privacy in these circumstances.[52]

[51] *United States v. Martinez*, 808 F.2d 1050, 1056 (5th Cir. 1987); *United States v. Rose*, 731 F.2d 1337, 1343 (8th Cir. 1984)*; United States v. Portillo*, 633 F.2d 1313, 1317 (9th Cir. 1980); *United States v. Miller*, 821 F.2d 546, 548-49 (11th Cir. 1987). In *Portillo* and *Miller*, the federal circuit courts noted that the borrowed-car scenario fits between two bookend cases on standing: *Rakas v. Illinois*, 439 U.S. 128 (1978) and *Jones v. United States*, 362 U.S. 257 (1960).

In *Jones*, the Supreme Court held that a defendant had standing to challenge the search of his friend's apartment, one in which he was staying, kept his clothes, and to which he had a key. *Jones*, 362 U.S. at 259-67.

In *Rakas*, the Supreme Court held that a car passenger lacked a reasonable expectation of privacy in the car in which he was riding. *Rakas*, 439 U.S. at 148. Although the passenger was in the car with the driver's permission, the passenger "asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized." *Id.* The items seized were found in the glove compartment and trunk, areas in which a passenger would not normally have a legitimate expectation of privacy. *Id*. at 148-49. The Court distinguished *Rakas* from *Jones*, noting that the defendant in *Jones* "not only had permission to use the apartment of his friend, but had a key to the apartment with which he admitted himself[,] . . . [he] kept possessions in the apartment[,] . . . Jones had complete dominion and control over the apartment and could exclude others from it." *Id.* at 149.

The Ninth Circuit in *Portillo* and the Eleventh Circuit in *Miller* held that a situation in which a defendant has both permission to use an automobile and the keys to the car is more similar to the scenario in *Jones* than that in *Rakas. See Portillo*, 633 F.2d at 1317; *Miller*, 821 F.2d at 548.

[52] *Matthews v. State*, 165 S.W.3d 104, 112 (Tex. App.–Fort Worth 2005, no pet.) ("A defendant . . . has standing to challenge the search of a car he does not own if he shows that he gained possession of the car from the owner with the owner's consent or from someone authorized to give permission to drive it."); *Rovnak v. State*, 990 S.W.2d 863, 867 (Tex. App.–Texarkana 1999, pet. ref'd) ("It is established in this state that a defendant has standing to challenge the search of an automobile he does not own if he shows he gained possession of the borrowed car from the owner or one authorized to give permission to drive it."); *Reyes v. State*, 910 S.W.2d 585, 589 (Tex. App.–Amarillo 1995, pet. ref'd) (same); *Stine v. State*, 787 S.W.2d 82, 85 (Tex. App.–Waco 1990, pet. ref'd) (defendant had standing to challenge search of a station wagon belonging to a customer of the repair shop at which defendant worked; the owner had authorized employees of the repair shop to test-drive the vehicle after it was repaired); *State v. Bassano*, 827 S.W.2d 557, 559-60 (Tex. App.–Corpus Christi, pet. ref'd) (defendant had standing to challenge search of wife's car; under Texas community-property laws, defendant had the right to possess and control the vehicle). *Cf. Nite v. State*, 882 S.W.2d 587, 591 (Tex. App.–Houston [1st Dist.] 1994, no pet.) (defendant lacked reasonable expectation of privacy because his name was not listed on the rental agreement and thus he lacked permission to drive the car); *Sutton v. State*, 711 S.W.2d 136, 138 (Tex. App.–Houston [14th Dist.] 1986, no pet.) (defendant failed to satisfy his burden to demonstrate standing because he did not put on any evidence indicating that he had the owner's consent to possess the car).

Officer Zimpelman said it best at the motion-to-suppress hearing: "Just like if you rent a car

from Enterprise, if you rent it, you're not the owner, you're leasing it. But you can let people

in your car or not let people in your car."

**B.    A borrower who abandons a car no longer has an expectation of privacy in it.**

No person can reasonably expect privacy in property he abandons. Thus, "when a

defendant voluntarily abandons property, he lacks standing to contest the reasonableness of

the search of the abandoned property."[53]  But merely discarding property is not synonymous

with abandonment. In order to abandon property, the decision to abandon must be voluntary,

and a defendant must intend to abandon the property.[54]

Abandonment is not voluntary if it is the product of police misconduct.[55]  It cannot be

"'coerced by unlawful police action such as approaching a suspect with the intention to arrest

without probable cause [or by] the initiation of an illegal investigatory stop or search.'"[56]

Intent to abandon "may be inferred from words, acts, and other objective facts–the

question being whether the actor has voluntarily discarded or relinquished his interest in the

---

[53] *Swearingen v. State*, 101 S.W.3d 89, 101 (Tex. Crim. App. 2003).

[54] *Comer v. State*, 754 S.W.2d 656, 659 (Tex. Crim. App. 1988) (op. on reh'g).

[55] *See e.g. id.*

[56] *Id.* at 658 (quoting 1 WILLIAM E. RINGEL, SEARCHES & SEIZURES; ARRESTS AND CONFESSIONS § 8.04(a) (1985)). In *Comer v. State*, this Court held that a defendant did not abandon a heroin-filled syringe when he got out of a car, dropped the syringe on the ground, and kicked it under the vehicle. *Id.* at 659. Because the police were unlawfully pursuing the vehicle in which the defendant was riding, we concluded that "the decision to abandon the property was a *direct result* of the police misconduct." *Id.*

property in question."[57]    The issue is not whether he intended to discard the property

permanently, but rather whether he abandoned the property in such a way "that he could no

longer retain a reasonable expectation of privacy with regard to it at the time of the search."[58]

Determining when a car is abandoned presents a unique challenge because cars differ

from other types of personal property.  They are somewhat like mobile locked suitcases.

> [A] car and an overcoat are different; one can hardly expect privacy in an
> overcoat left on the street, but cars are regularly parked on the street for brief
> periods of time without an expectation that they will thereby be subject to
> entry.[59]

But despite this inherent difference, when the circumstances indicate that a person intended

to abandon a car, he also abandons any reasonable expectation of privacy in it.  Thus,

"[c]ourts have . . . found cars to be abandoned when it appeared that the operator of a vehicle

left the car behind in an effort to avoid apprehension by the police."[60]

---

[57] *United States v. Scrivner*, 680 F.2d 1099, 1100 (5th Cir. 1982). *See also McDuff v. State*, 939 S.W.2d 607, 616 (Tex. Crim. App. 1997) ("[A]bandonment is primarily a question of intent to be inferred from words spoken, acts done, and other objective facts and relevant circumstances").

[58] *McDuff*, 939 S.W.2d at 616.

[59] 1 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 2.5(a), at 649 (4th ed. 2004).

[60] *Id.* "Sometimes the car had actually been pursued by the police for some distance, after which the driver jumped from the car and fled on foot. On other occasions the vehicle was parked when the occupant, upon seeing the police approach, exited the vehicle and took flight." *Id. See also United States v. Edwards*, 441 F.2d 749, 749-53 (5th Cir. 1971) ("Defendant's right to Fourth Amendment protection came to an end when he abandoned his car to the police, on a public highway, with engine running, keys in the ignition, lights on, and fled on foot."); *United States v. Tate*, 821 F.2d 1328, 1330 (8th Cir. 1987) (suspect who fled unlocked vehicle parked on public road abandoned expectation of privacy); *Rodriguez v. State*, 773 S.W.2d 821, 823 (Ark. 1989) (suspect who, after a high speed chase ending at air strip, exited the car, and fled by foot had no reasonable expectation of privacy; he had left the car running and the door open); *People v. Hampton*, 603 P.2d

**C.      Appellant Lost His Standing to Challenge the Search of the Borrowed Van When He Took Flight and Abandoned It.**

Before appellant fled, he had both a subjective and reasonable expectation of privacy in the white van.  Appellant exercised a subjective expectation of privacy when he refused to consent to the search of the vehicle.  The fact that his refusal was based on his argument that the van did not belong to him is not dispositive.  Appellant did not claim that he had not been using the car, or that he had no connection to the car; he stated that the car did not belong to him, which was true, but that does not alone extinguish a right to privacy.  Furthermore, appellant's expectation of privacy was reasonable.  The evidence at the motion to suppress showed that appellant had permission to use the vehicle, which belonged to Joaquin Cardona. Appellant was in the driver's seat, the doors were closed, and the keys were in the ignition. There was no evidence that the van's owner had revoked his consent or limited its scope.

However, appellant abandoned his reasonable expectation of privacy in the van when he fled.  As explained above, the investigative detention of appellant was lawful.  Officer Zimpelman got on his radio and requested a K-9 unit to perform a walk-around.  When

133, 135 (Colo. 1979) (suspect who fled from borrowed car and left keys in the ignition lacked standing to challenge the search); *People v. Washington*, 413 N.E.2d 170, 177 (Ill. App. Ct. 1980) (defendant has no legitimate interest in borrowed car from which he fled; the car was unlocked and the ignition key was left in it); *Henderson v. State*, 695 P.2d 879, 882 (Okla. Crim. App. 1985) (driver's flight constitutes abandonment of vehicle); *State v. Green*, 605 P.2d 746, 749 (Ore. 1980) ("Where two suspected thieves have been pursued from the scene of an apparent burglary and finally leap from their car and flee, they have abandoned any expectation of privacy with respect to the car in the same way that a fleeing robber who drops a bag of loot has abandoned the loot.").

Officer Rodriguez began walking appellant to the patrol car to await the K-9 unit, appellant "took off running," leaving the keys in the ignition of the vehicle. Appellant ran for two blocks and entered a vacant field. He stopped only when Officer Zimpelman activated his taser and pointed it at appellant. These circumstances show that appellant intended to abandon any expectation of privacy in the van he left behind.[61]

**IV. Conclusion**

In sum, appellant's detention was supported by reasonable suspicion. The officers did not rely solely on the content of an anonymous tip; other circumstances including the location, the time of night, and appellant's suspicious behavior, combined with the officers' corroboration of innocent details of that tip, contributed to their suspicion. Thus the initial investigatory detention of appellant was lawful, and the officers were diligent in calling for a K-9 dog to confirm or dispel that original suspicion.

We also agree with the court of appeals that appellant lacked standing to challenge the search of the van, but for somewhat different reasons that those relied upon by the trial or appellate courts. Although a person generally has an expectation of privacy in a borrowed vehicle, appellant abandoned this expectation of privacy by fleeing from the van.

---

[61] *See McDuff v. State*, 939 S.W.2d at 616 (defendant lacked standing to challenge search of car when he pushed it into a motel parking lot and left it for several days); *Gonzales v. State*, 190 S.W.3d 125, 135 (Tex. App.–Houston [1st Dist.] 2005, pet. ref'd) (defendant abandoned his standing to challenge search of his car when he left it in a parking lot in a different city, improperly parked, with one door open, and items scattered near car, and bought a bus ticket to a different city); *see also* note 60 *supra*.

Therefore, we affirm the judgment of the court of appeals.

Delivered: June 11, 2014
Publish