In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-15-00155-CR**

**CHRISTOPHER LEE CUTTRELL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 221st District Court**
**Montgomery County, Texas**
**Trial Cause No. 14-08-09341 CR**

**MEMORANDUM OPINION**

Christopher Lee Cuttrell (Cuttrell or Appellant) pleaded guilty to the offense of fraudulent possession of items of identifying information, a state jail felony. *See* Tex. Penal Code Ann. § 32.51(c)(1) (West Supp. 2015). The court sentenced Cuttrell to six months' confinement in state jail. Cuttrell timely appealed, raising two issues wherein he challenges the trial court's denial of his motion to suppress and the attorney's fees assessed against him in the judgment. We affirm the trial court's judgment as modified.

BACKGROUND

Cuttrell was indicted on November 26, 2014, for one count of fraudulently possessing items of identifying information—for possessing fewer than five pieces of identifying information belonging to another, specifically a person's social security number. The initial complaint stated that a search by law enforcement of Cuttrell's vehicle on August 21, 2014, revealed Cuttrell was in possession of "50 or more" items of identifying information belonging to persons other than Cuttrell or his family.[1] On September 25, 2014, prior to trial, Cuttrell filed a Motion to Suppress, asking the court to suppress the arrest, evidence obtained pursuant to the search of his car, and any statements by Cuttrell because the search was unconstitutional. On January 20, 2015, the trial court conducted a hearing on the motion.

Deputy Theo Pternitis (Pternitis) testified at the suppression hearing that, on August 21, 2014, he was "towards the back of" The Woodlands when he observed an older model vehicle exit a parking lot and turn around, returning to "the exact, same location they just turned off of." Pternitis explained that

> I waited for a minute because they didn't go into a parking spot
> and I noticed they didn't go back out on Research Forest nor did they

---

[1] Both the complaint as well as the indictment listed Cuttrell's wife, Heather Cuttrell, as a co-defendant. She is not a party to this appeal.

exit the vehicle doing business so I figured either they were having vehicle problems or they were lost or needed some kind of assistance.

Pternitis agreed that his initial contact with the occupants was for a welfare check. Pternitis said the car was occupied by Cuttrell, Cutrell's wife, and two children – a girl about sixteen years old and a boy about thirteen years old. According to Pternitis, the occupants told him they were coming from League City, they were "going to Dallas on a family trip[,]" and they were looking for a hotel. The deputy said the family told him they got lost because the GPS on their phone was not working. Pternitis explained that, at the time, he thought it was odd that the family was looking for a hotel in that area of The Woodlands, which Pternitis described as "about 20 minutes from Interstate 45 which is a straight shot from Houston up to Dallas[,]"and that it also raised his suspicion that Cuttrell's wife, who was in the front passenger seat, and not Cuttrell, answered Pternitis's questions.

Pternitis said he decided to notify dispatch that he "was going to be out on a suspicious vehicle, not a traffic stop or anything but an investigative stop," in order to identify the driver and see if he had a valid driver's license. Pternitis said that he asked Cuttrell for his license, and Cuttrell responded that "[h]e didn't have it on him. It was in the trunk." Pternitis stated he found this response "a little odd." According to the deputy, when Cuttrell asked if he could get his license from the trunk, Pternitis agreed and Cuttrell's wife "exited the vehicle with him as well and

3

she went to go open the trunk with a screwdriver." Pternitis testified that Cuttrell told Pternitis that his license was invalid or suspended. Pternitis then called dispatch and gave Cuttrell's name and date of birth to dispatch. Dispatch advised that the license was invalid and suspended. Pternitis also testified that Cuttrell also told him that he had previously been arrested for narcotics, and fraud or forgery, and that he was currently on probation. According to Pternitis, the sixteen-year-old occupant did not have a driver's license, and dispatch advised that Cuttrell's wife's license was also suspended.

Pternitis testified that the lock on the trunk of the car "looked punched. It was disabled or something." When Cuttrell's wife opened the trunk with a screwdriver, Pternitis could see the contents of the trunk. The deputy described the contents of the trunk as follows:

Q. What about what was in the trunk raised your suspicion if anything?

A. I found it odd that there was a laptop computer with a laser printer in the trunk of his vehicle just sitting in a box loosely, not in a case, but sitting in the trunk.

Q. What type of computer was it?

A. If I'm not mistaken it was an Alienware, which I was recently in the market for a laptop and I know that an Alienware was one of the higher end laptop, several thousand dollars for the laptop.

4

Q. Why was the fact that such an expensive laptop being in the trunk of a car odd?

A. I found it odd due to the fact that, yes, this was an older vehicle and they advised several times that they did not have air conditioning in the vehicle and having this expensive laptop, laser printer in the vehicle where it could be bounced around and be jostled and not kept in a safe, controlled environment up in the cab of the passenger's seat.

. . . .

Q. Did the defendant ever tell you what their purpose was for driving --

A. A family outing.

Q. A vacation?

A. Yes, sir. . . .

. . . .

Q. Did anything about that trunk strike you as they were on vacation?

A. There wasn't any luggage.

The deputy testified that whenever he looked inside the vehicle, "they continually directed [his] attention to them at the back of the vehicle while [Cuttrell's wife] kept on constantly messing around with her cell phone at the front of the vehicle." Pternitis explained his thoughts at the time:

There was something they didn't want me seeing inside the vehicle or I didn't know exactly what she was trying to do with her cell phone. I had to ask her numerous times to leave the phone alone at the time. If she was having problems with the battery, she needed to just leave it plugged in. I wasn't sure exactly what was going on.

5

Pternitis testified that he could not let the family drive away because none of them had a valid license, and they could not leave their car in the parking lot for liability reasons, because "[i]t was private property[,]" and it was in a fire lane, which was a parking violation. Pternitis explained that he asked Cuttrell if they knew someone that could pick them up and also pick up the vehicle for them. Pternitis said he understood the family to tell him that someone who was possibly an hour away could pick up the car.

Pternitis agreed that, in less than ten minutes after encountering the Cuttrells, he felt he no longer had a welfare-check situation but rather a suspicious vehicle. According to Pternitis, at some point his sergeant came onto the scene with him and his sergeant asked to search the vehicle. Pternitis testified that he asked the Cuttrells multiple times if they objected to him searching their vehicle. The deputy explained Cuttrell's response to this request:

> A. They didn't really see the point in it, and Mr. Cuttrell advised even if he were to say no, we would search it anyway. He always ends up in handcuffs going to jail when the police search his vehicle.
>
> Q. Did that raise your suspicion at all?
>
> A. Definitely.
>
> Q. And what did you explain to Mr. Cuttrell?

6

A. I advised him if he didn't want to search the vehicle it was his right to refuse. I wasn't going to search it if he didn't want me to unless I had probable cause to search the vehicle.

Pternitis explained that, at this point, he had been on the scene ten or fifteen minutes. Pternitis said he did not order anyone out of the vehicle, but the family asked him if they could step out of the car because it was hot and they did not have air conditioning, and Pternitis agreed. According to Pternitis, the four family members got out of the car "for comfort reasons[,]" and Pternitis asked for another unit to come help him for safety reasons. Pternitis testified that he had taken the extra-length screwdriver "for officer safety[]" and lowered the lid to the trunk but did not close it because the lock did not work. On cross-examination, Pternitis agreed that at that time, the situation was "investigative[]" and the Cuttrells were being detained and they would not have been allowed to leave.

The deputy stated that, when the Cuttrells refused the request to search the vehicle, he inquired as to whether a canine was available nearby to do a canine search, explaining his suspicions as follows:

. . . I believe[d] there was something in the vehicle that they didn't want me to see due to them trying to divert my attention from it constantly and, obviously, [Cuttrell] stated every time law enforcement searches his vehicle he end [sic] up in handcuffs and going to jail. So it led me to believe there was something in that vehicle that didn't belong.

. . . .

7

> I suspected, due [] to the fact that he said he's always been handled for narcotics, there may possibly be narcotics in the vehicle. So I asked for a canine to come and sniff for the odor.
>
> . . . .
>
> It was not only the fact that there could be a possibility of narcotics, but, also, it would be a number of things. I also wanted to check that laptop and make sure it wasn't stolen.
>
> . . . .
>
> Every time I would ask one person a question the other person would try to answer for them or always come in and answer. It was [Cuttrell's wife] who kept on [answering] whenever I would ask Mr. Cuttrell a question . . . .

He explained that the Cuttrells were not free to leave "after [he] checked out a suspicious vehicle and [he] believe[d] there's suspicious activity going on[.]"According to Pternitis, it took about twenty minutes for the canine unit to arrive, and he had to keep Cuttrell there because he "didn't have a legal person to drive the vehicle and was waiting to get the vehicle moved." Pternitis said that, at this point, he had been with the Cuttrells about forty-five minutes.

Pternitis agreed that at some point the Cuttrells asked to leave to "go buy something or be a patron so they could get [the person] who was going to come help them remove the vehicle" but the deputy did not allow them to leave. Pternitis testified that Cuttrell's "invalid driver's license" was an "arrestable offense." However, he also testified that the Montgomery County jail does not accept anyone

8

arrested for an invalid driver's license. The deputy explained in a situation where no vehicle occupant has a valid license, the Department policy was to "Find [a] licensed driver or tow the vehicle." He also explained that the Cuttrells never asked for his help in contacting someone for help, but rather they used their own phones and that he was not able to take the family anywhere himself because he was on a motorcycle. The deputy explained that he did not immediately call for a tow-truck when he determined there was no licensed driver because Cuttrell's wife "kept on asking, 'Please, can we find somebody?'"

According to Pternitis, when the canine unit arrived, the dog gave a positive alert on the car and also made several attempts to go inside the vehicle. Pternitis stated the officers found marijuana in the trunk of the vehicle and that

> Inside the vehicle there was a box containing gift cards to Social Security card [sic] that didn't have a name matching anybody in vehicle. There was laminating paper with numbers printed onto it and then some gift cards that were altered with the other numbers affixed to them.

No other witnesses testified at the hearing. A video recording of the encounter was admitted into evidence. Pternitis testified that the recording was made by a camera mounted on his chest, and that the policy of the Montgomery County Sheriff is to record all contacts. The video recording includes video and audio of Cuttrell telling Pternitis that the family was going to Dallas to visit his

9

father. Later, in the video, Cuttrell's wife can be heard telling Pternitis that the family was going to Austin and San Antonio and that they were looking for the mall in The Woodlands. The video recording shows Cuttrell and his wife exit the vehicle voluntarily, without a request by Pternitis, open the trunk and look for Cuttrell's driver's license. According to the video, at the time of the dog sniff, the windows to the car were open, at least two doors to the car had been left open by family members, and the trunk of the car was open. The video recording also shows that, after the dog gave a positive alert, officers searched and found marijuana located in a tampon box inside Cuttrell's wife's purse which was found in the trunk of the car. Cuttrell's wife can be heard on the video telling the officers that the marijuana belonged to her son. In the audio portion of the recording, officers can be heard saying they also found gift cards and "papers with . . . stuff cut up."

On January 22, 2015, the trial court denied Cuttrell's motion to suppress, and on January 23, 2015, Cuttrell pleaded guilty. Cuttrell's plea agreement did not waive his right to appeal the court's order denying his motion to suppress. The court then sentenced Cuttrell to six months in state jail. On January 26, 2015, Cuttrell filed a Request for Findings of Fact and Conclusions of Law, and the court entered findings of fact and conclusions of law on February 5, 2015. Cuttrell

timely filed a notice of appeal challenging the denial of his motion to suppress. In his appellate brief, he also argues that the trial court erred in assessing attorney's fees against him.

STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial court's factual findings for an abuse of discretion. *Id.* We give almost total deference to the trial court's determination of historical facts, particularly when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). The same deference is afforded the trial court with respect to its rulings on the application of the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of credibility and demeanor. *Id.* For mixed questions of law and fact that do not fall within that category, a reviewing court conducts a de novo review. *Id.*

At a suppression hearing, the trial court is the exclusive trier of fact and judge of the credibility of the witnesses. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). A trial court may choose to believe or to disbelieve all or any part of a witness's testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim.

11

App. 2000). We must uphold the trial court's ruling on a motion to suppress if that ruling was supported by the record and was correct under any theory of law applicable to the case, even if the trial court gave the wrong reason for its ruling. *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004). Our task is to determine whether the trial court could have reasonably denied appellant's motion to suppress given the evidence in the record and applicable law. *Id.*

## MOTION TO SUPPRESS

In his first issue, Cuttrell contends that the trial court erred in denying his motion to suppress. Cuttrell argues that the warrantless search of Cuttrell's car was improper because the deputy did not have reasonable suspicion to detain Cuttrell. The State responds arguing that: (1) the initial encounter between Cuttrell and Pternitis was consensual and a reasonable person in Cuttrell's shoes would have felt free to leave or otherwise terminate the encounter; (2) the deputy had reasonable suspicion to detain Cuttrell for investigatory purposes, considering the totality of the circumstances ; and (3) the circumstances "raised more than enough suspicion to justify continued detention for purposes of conducting a canine sweep of the appellant's vehicle." The State also contends that, "when the canine alerted

12

on the appellant's vehicle, the officers at the scene had probable cause to conduct a warrantless search of the vehicle."

The Fourth Amendment protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *State v. Rendon*, 477 S.W.3d 805, 808 (Tex. Crim. App. 2015); *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). To suppress evidence based on an alleged Fourth Amendment violation, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. *Amador v. State*, 221 S.W.3d 666, 672 (Tex. Crim. App. 2007). A defendant satisfies this burden by establishing that a search or seizure occurred without a warrant. *Id.* The State then has the burden to establish that the search or seizure was conducted pursuant to a warrant or was reasonable under the totality of the circumstances. *Id.* at 672-73.

An encounter takes place when an officer approaches a citizen in a public place to ask questions, and the citizen is willing to listen and voluntarily answers. *Crain*, 315 S.W.3d at 49. Consensual encounters between police and civilians require no objective justification. *See State v. Castleberry*, 332 S.W.3d 460, 466 (Tex. Crim. App. 2011). A consensual interaction or encounter between a civilian and police does not trigger Fourth Amendment protection, and the civilian is free to terminate the encounter and to leave. *Crain*, 315 S.W.3d at 49. As part of an

officer's community caretaking function and the duty to "serve and protect," an officer may stop an individual whom the officer reasonably believes is in need of help. *Corbin v. State*, 85 S.W.3d 272, 276 (Tex. Crim. App. 2002).

By contrast, an investigative detention occurs when a person yields to a police officer's show of authority under a reasonable belief that he is not free to leave. *See Castleberry*, 332 S.W.3d at 466-67. When the court determines whether an interaction constituted an encounter or a detention, the court focuses on whether the police officer conveyed a message that compliance with the officer's request was required or whether a reasonable person in the civilian's position would have felt free to decline the officer's requests or otherwise terminate the encounter. *Id.* Examples of circumstances that might indicate a detention has occurred, even where the civilian did not attempt to leave, are "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554-55 (1980) (citing among other sources *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)); *Crain*, 315 S.W.3d at 49-50.

Generally speaking, an officer is justified in briefly detaining an individual on less than probable cause and without a warrant in order to investigate possible

14

criminal behavior where the officer can "'point to specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.'" *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000) (quoting *Terry*, 392 U.S. at 21). "To support an investigatory detention, 1) the officer's actions must be justified at the inception of the detention, and 2) the detention must be reasonably related in scope to the circumstances that justified the interference in the first place." *Thomas v. State*, 420 S.W.3d 195, 199 (Tex. App.—Amarillo 2013, no pet.). When an officer has reasonable suspicion to believe that a person is violating the law, the officer may temporarily detain the person for investigation. *State v. Sheppard*, 271 S.W.3d 281, 287 (Tex. Crim. App. 2008) (citing *Terry*, 392 U.S. at 21); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Ford*, 158 S.W.3d at 492-93. The officer must be able to articulate something more than an "inchoate and unparticularized suspicion" or merely a "hunch." *Jaganathan v. State*, 479 S.W.3d 244, 247 (Tex. Crim. App. 2016); Foster *v. State*, 326 S.W.3d 609, 613 (Tex. Crim. App. 2010) (quoting *Terry*, 392 U.S. at 27).

15

An investigative stop can last no longer than necessary to effectuate the purpose of the stop. *Kothe v. State*, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004) (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)); *see also Rodriguez v. United States*, 135 S. Ct. 1609, 1611-12 (2015) (where the officer's original mission is a traffic stop, a dog sniff for criminal activity unrelated to the traffic mission requires individualized reasonable suspicion). A temporary detention may continue for a reasonable period of time until an officer has confirmed or dispelled his original suspicion of criminal activity, and having a trained drug dog perform an "open air" search by walking around a vehicle is one reasonable method of confirming or dispelling a reasonable suspicion that a vehicle contains drugs. *Matthews v. State*, 431 S.W.3d 596, 603-04 (Tex. Crim. App. 2014). A positive alert by a certified drug dog is usually enough, by itself, to give officers probable cause to search. *See id.* ("If the dog alerts, the presence of drugs is confirmed, and police may make a warrantless search."); *State v. Weaver*, 349 S.W.3d 521, 527-28 (Tex. Crim. App. 2011).

In its findings of fact, the trial court expressly found Deputy Pternitis "was a credible witness" and that "his testimony was true and accurate." The trial court also concluded that, once Pternitis determined that Cuttrell was driving with a suspended license, the encounter became a detention for the purpose of

16

investigation because Pternitis then had reasonable suspicion to believe that Cuttrell was violating the law. *See Sheppard*, 271 S.W.3d at 287 (an officer may temporarily detain the person for investigation when the officer has reasonable suspicion to believe that a person is violating the law).

Additionally, the evidence presented at the hearing established that Pternitis could not allow the family to drive away as none of the occupants of the vehicle had a valid driver's license, and the Montgomery County Sheriff's policy did not permit the officer to take Cuttrell to jail for driving with a suspended license. The trial court concluded that the detention was reasonable because Pternitis had not yet concluded the initial investigation. *See Matthews*, 431 S.W.3d at 603 (a temporary detention may continue for a reasonable period of time until an officer has confirmed or dispelled his original suspicion of criminal activity).

During the detention, Pternitis observed the following: Cuttrell was unable to explain why the family was in that part of The Woodlands if they were on their way to Dallas; when Pternitis asked Cuttrell a question, Cuttrell's wife answered; whenever Pternitis attempted to look through the windows into the vehicle, the family attempted to distract him and he thought something was in the car the family did not want Pternitis to see; an unprotected expensive laptop and printer were in the trunk of the car, but there was no luggage, even though the family was

17

on vacation; and Cuttrell was on probation for drug charges. The trial court concluded that Pternitis had specific, articulable facts that, together with rational inferences from those facts, could have led him to reasonably conclude that Cuttrell was, had been, or soon would be engaged in criminal activity. According to the testimony from Pternitis, based on his observations and experience, Pternitis suspected that the family could be hiding something, specifically that narcotics could be inside the vehicle. *See Ford*, 158 S.W.3d at 492-93.

The trial court found that, shortly after arriving at the scene, a trained canine alerted to the presence of narcotics in the vehicle. The trial court also found that the dog's positive alert for narcotics established probable cause to search the entire vehicle and any compartments or containers that could reasonably hold narcotics. *See Matthews*, 431 S.W.3d at 604 (a positive alert by a trained drug dog confirms the presence of drugs, after which the police may make a warrantless search of a vehicle).

On this record, and deferring to the trial court's findings of fact, the trial court could have reasonably concluded that the warrantless search was reasonable under the totality of circumstances. *See Amador*, 221 S.W.3d at 672-73 (Once a defendant has proved the search was warrantless, the State has the burden to establish that the search or seizure was reasonable under the totality of the

circumstances or conducted pursuant to a valid warrant.). We conclude that the trial court's ruling denying the motion to suppress was supported by the record and was correct under the applicable law. The trial court did not err in denying Cuttrell's motion to suppress, and we overrule Cuttrell's first issue on appeal.

## ATTORNEY'S FEES

In his second issue, Cuttrell argues that after being found indigent, his status did not change before he was sentenced. He contends that the trial court erred in assessing $3,525 in attorney's fees in the judgment. The State agrees.

A trial court may tax a defendant who was previously declared indigent with attorney's fees if there is a material change in the defendant's ability to pay attorney's fees between the date the trial court initially determined the defendant to be indigent and appointed trial counsel and the date of the final judgment. *See* Tex. Code Crim. Proc. Ann. arts. 26.04(p), 26.05(g) (West Supp. 2015); *see also Roberts v. State*, 327 S.W.3d 880, 884 (Tex. App.—Beaumont 2010, no pet.).

In this case, the record shows that the trial court found Cuttrell to be indigent and appointed trial counsel before entry of the judgment. Following Cuttrell's sentencing, the trial court also appointed counsel to represent Cuttrell in his appeal. The trial court made no findings regarding whether any material change occurred in Cuttrell's status as an indigent defendant. Furthermore, the appellate record does

not reflect that Cuttrell's financial circumstances materially changed after he was found indigent. *See* Tex. Code Crim. Proc. Ann. art. 26.04(p); *Mayer v. State*, 309 S.W.3d 552, 556 (Tex. Crim. App. 2010); *Roberts*, 327 S.W.3d at 884. Therefore, we sustain issue two.

The Texas Rules of Appellate Procedure authorize this Court to render the judgment the trial court should have rendered. *See* Tex. R. App. P. 43.2, 43.3. Therefore, we modify the judgment of the trial court by deleting the award of $3,525 in attorney's fees. Otherwise, we affirm the trial court's judgment as modified.

AFFIRMED AS MODIFIED.

_____
LEANNE JOHNSON
Justice

Submitted on February 22, 2016
Opinion Delivered April 13, 2016
Do Not Publish

Before McKeithen, C.J., Horton and Johnson, JJ.