**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-20-00061-CR**
**NO. 09-20-00062-CR**
_____

**TROY WAYNE HARMON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 221st District Court
Montgomery County, Texas
Trial Cause Nos. 19-12-16953-CR & 19-12-16954-CR

**MEMORANDUM OPINION**

A grand jury indicted Appellant Troy Wayne Harmon of two counts of first-degree-felony possession with intent to deliver a controlled substance in an amount of four grams or more but less than 200 grams. In trial cause 19-12-16953-CR, Harmon was indicted for possession of heroin, and in trial cause 19-12-16954-CR, Harmon was indicted for possession of methamphetamine. Both indictments alleged one previous felony conviction for enhancement purposes. The jury found Harmon

1

guilty on both counts, Harmon pleaded "true" to the enhancement paragraph in both counts, the jury assessed punishment at sixty years of imprisonment for each charge, and the trial court ordered that the sentences run concurrently. In a single issue on appeal, Appellant argues that the trial court erred by denying him the opportunity to call a Special Agent to testify in a pretrial hearing to convince the trial court to order disclosure of the identity of a confidential informant (CI). We affirm.

Pretrial Hearing

In a pretrial hearing, the defense requested disclosure of a CI's identity because the CI allegedly had information relevant to guilt or innocence:

> . . . the information specifically being that supposedly my client deals in ounces of drugs, supposedly my client uses a tube sock to hide the drugs, supposedly my client drives a certain car, supposedly my client is going to be at a certain location at a certain time. These are all relevant facts only which the informant has.
> And so, therefore, it becomes necessary to determine the extent of the bias, the extent of the training, the extent of the expertise of this informant. Otherwise, this is all hearsay. . . .

The defense argued that law enforcement would not have known that Harmon allegedly carried drugs in a black sock and dealt in ounce-size quantities but for the CI.

The State argued that law enforcement knew there was an open warrant for Harmon, they approached Harmon in an open area, and they did not search Harmon. The State also argued that the CI was not present when law enforcement approached

2

Harmon, the CI did not have information material to Harmon's guilt or innocence, and the State would not be relying on the CI to establish guilt or innocence.

The trial court noted there was a warrant for Harmon's arrest and that an abandoned tube sock was found on the ground where Harmon had been standing, and that the CI was not present at the time of the search. The trial court concluded that the defense had not met the threshold test for disclosure of the CI's identity and denied the defense's request for a hearing, stating there was nothing to suggest that the CI was present where the sock was found, had anything to do with the search, or had firsthand knowledge of this case.

Evidence at Trial

Testimony of Trooper Brit Lopez

Brit Lopez, a highway patrol trooper with the Texas Department of Public Safety (DPS), testified that he was on patrol on the night of July 30, 2019. Lopez testified that he knew of Harmon from a previous encounter and had learned there was an active felony warrant for Harmon in Montgomery County for failure to appear in court. Lopez also testified he went to look for Harmon based on the active warrant and because Special Agent Ward, a narcotics detective for DPS, had received information that Harmon was selling or distributing heroin and methamphetamine in ounce levels and that Harmon kept the drugs "balled up in a black tube sock." Agent Ward had informed Lopez that Harmon was going to be at

an address in Magnolia, and Lopez went to that area. As Lopez turned onto the street, he observed Harmon standing next to a silver car, on the left side of the car near the front, talking with someone later identified as Jason Tahtinen. Lopez did not stop to detain or arrest Harmon at that time because Lopez was alone, he did not know the person with Harmon, and there might have been guns at the scene. Lopez continued down the street and called the constable's office, which sent Sergeant Bronson Christopher to the scene. About five minutes later, Sergeants Christopher and Williams arrived, and the officers returned to the address to look for Harmon. The officers searched in the property near the vehicle for about an hour, a DPS helicopter was called to attempt to locate Harmon in the nearby wooded area, but Harmon was not found.

After not finding Harmon, Lopez returned to the vehicle where he had observed Harmon and which was registered to Harmon. Sergeant Williams deployed a K-9 around the vehicle, the K-9 alerted to the odor of narcotics coming from the vehicle, and Lopez searched the vehicle. Lopez testified that, while searching the vehicle, he discovered that pieces of the vehicle came loose that ordinarily do not, and he regarded the vehicle as "a dope running car[,]" because parts of the vehicle were easily removed and could be used to store drugs. Inside the vehicle, Lopez found a black backpack that contained vitamins, pain medication, a bag of syringes, a loose syringe, guitar picks, measuring spoons, a razor blade with crystal meth

4

residue, more than fifty clear ounce-sized ziplock-style baggies, and some Suboxone strips. Lopez regarded these items as an indication of narcotics dealing, and in his experience, it was common in that area for people to use such syringes with methamphetamine or heroin.

Lopez testified that Agent Ward arrived at the scene, and Ward was going to search the engine compartment. Ward found "a black balled-up tube sock" on the ground that contained "a large amount of crystal methamphetamine, black tar heroin and china white heroin[]" about four feet in front of the vehicle on the driver's side, and Lopez testified this was where he had seen Harmon standing. According to Lopez, the sock did not look like it had been outside "in the elements[]" for long. Lopez identified State's Exhibit 1 as the narcotics that were in the sock.

Lopez recalled that the next contact he had with Harmon was on August 1 at a motel in Harris County, and Lopez confirmed the open warrant for Harmon, and then he detained Harmon in handcuffs. When he searched Harmon, he found one loose syringe in his back pocket, guitar picks in his front pocket, and about $1700 in cash in his wallet. After Lopez read Harmon his *Miranda* rights, he asked Harmon about the night of July 30, and Harmon told him he saw the police drive by that night and then walked off into the woods to check some fishing lines and then Harmon went to a friend's house. Harmon also told Lopez that he takes vitamins and pain

medication because "he is getting old[,] and it is harder for him to play the guitar[]" and Harmon told Lopez that the backpack belonged to a friend.

Lopez identified State's Exhibit 6 as a still image from his in-car video from that day, which Lopez described as picturing the items he obtained from Harmon's pockets. Lopez also identified State's Exhibits 7 and 8 as recordings of him searching Harmon's car and the arrest of Harmon, and the video exhibits were published to the jury.

Testimony of Sergeant Marshall Williams

Sergeant Marshall Williams testified that he works in the narcotics and alcohol patrol division of the Precinct 5 Montgomery County constable's office, he is a K-9 handler, and his K-9 is trained to locate and find narcotics. According to Williams, his dog is trained only to search the area Williams tells him to search and does not search anything else. According to Williams, when his dog alerts on a vehicle, it means narcotics have been present in the vehicle at some time.

Williams testified that on July 30, 2019, he heard that a subject fled from Trooper Lopez, Williams decided to go help Lopez search for the subject, and Sergeant Christopher went to the scene also. According to Williams, the officers searched around a residence and nearby wooded area for about three hours, and they also called DPS to search by air. The officers returned to the vehicle where Harmon, the suspect, had initially been seen, and they checked the interior and popped the

6

trunk to see if Harmon was hiding in the vehicle. Williams testified that Lopez thought Harmon may have fled if narcotics were in the vehicle, Lopez asked Williams to deploy his K-9, Williams told his dog to search the vehicle, and his dog made a positive alert on the vehicle's trunk and the passenger's side front door. Williams testified that the drugs found on the scene were not in the vehicle but were in a black tube sock about ten or fifteen feet in front of the vehicle.

Testimony of Sergeant Bronson Christopher

Sergeant Bronson Christopher, a patrol supervisor for the Precinct 5 constable's office, testified that on July 30, 2019, he received a call from Trooper Lopez, who requested assistance because Trooper Lopez had seen someone who had an open felony warrant. Christopher arrived at the scene a few minutes later, where he saw Lopez sitting at the end of a driveway and another person named Tahtinen standing next to a vehicle. According to Christopher, the officers searched the property for several hours with assistance from a DPS helicopter, and they interviewed people inside the nearby residence, but they did not see Harmon. Christopher testified that the K-9 performed a free air search of the vehicle, after which the officers searched the vehicle. Christopher recalled that the parts of the vehicle fell off easily, and Christopher believed the vehicle was designed for narcotics trafficking. Christopher testified that inside the vehicle was a black backpack that contained clear plastic baggies and a bag of syringes, a keyboard was

in the back seat, and a guitar was in the trunk. According to Christopher, the baggies were significant because they are used to separate quantities of narcotics for sale. Christopher also testified that syringes are used with narcotics that have been heated and liquified.

Christopher recalled that the drugs in State's Exhibit 1 were found in a clean black tube sock a short distance from the front of the vehicle. According to Christopher, Agent Ward found a black sock on the ground, took out its contents—including methamphetamine, black tar heroin, and white heroin—and placed the sock on the hood of the car. Christopher testified that the quantity of methamphetamine and heroin in State's Exhibit 1-A was "definitely indicative of an intent to deliver[]" and "way more" than a "user amount."

Testimony of Special Agent Craig Ward

Craig Ward testified that he is a Special Agent working on narcotics cases for DPS where the focus is on large-scale investigations and drug trafficking and not typically individual users. Ward testified that most of the methamphetamine in the U.S. today comes from Mexico, and that a lot of drug traffickers get caught during travel. According to Ward, traffickers may distance themselves from their narcotics by fleeing and leaving the drugs behind if they feel their life is in danger.

Ward recalled that on July 30, 2019, as a Special Agent in narcotics, he received information that Troy Harmon was "an ounce level methamphetamine and

8

heroin trafficker[]" who would be at a specific location that night. Ward also learned that there was a warrant for Harmon on another charge, and he contacted Trooper Lopez to locate Harmon at the specified location in Magnolia. Lopez later contacted Ward, and Ward went to the scene to assist with the vehicle search. Ward testified that while the other officers searched the vehicle, Ward focused on the area in front of the vehicle where Harmon was last seen standing, and he observed a black sock rolled up on the ground, about three to four feet in front of the vehicle, which he gave to Trooper Lopez. According to Ward, he had learned that Harmon traffics ounce quantities of methamphetamine and heroin in a black tube sock. Inside the sock was "a large amount of methamphetamine" and two types of heroin. Ward testified that the amounts found were "definitely not something you would find on an average user[]" but would be an amount used for trafficking. Ward recognized State's Exhibit 1 as the drugs found and the packaging used to submit the drugs to the crime lab. According to Ward, other drug paraphernalia was found in the vehicle, including needles, plastic baggies, a scale, and a razor blade with methamphetamine residue as well as guitar picks, pain medication, and vitamins.

On cross-examination, Ward testified that he learned from a cooperating individual or CI with whom he had previously worked that Harmon was a drug trafficker. According to Ward, the CI told him there was a possibility Harmon was going to be at a specific location on July 30, 2019. Ward testified that he did not

9

know there was an arrest warrant out for Harmon, but Lopez had knowledge of the outstanding arrest warrant, and Lopez attempted to apprehend Harmon based on that warrant alone.

Ward agreed they did not find Harmon that night, but a few days later, he received some information that Harmon might be staying at a hotel on FM 1960. Ward conducted surveillance at the hotel, and Trooper Lopez was nearby. Ward testified that he identified Harmon as he left a hotel room and walked downstairs, and then Ward contacted Trooper Lopez, who arrested Harmon. Ward recalled that, when Harmon was searched that day, a guitar pick, and a syringe were found in his pockets.

Testimony of Somiyeh Zalekian

Somiyeh Zalekian, a forensic scientist with DPS in the Houston crime lab, testified that she analyzed the materials in State's Exhibit 1, and written on the envelope were her initials and the date she performed her analysis. Zalekian testified that two substances were in the envelope, one substance contained methamphetamine, and the other contained heroin. Zalekian identified State's Exhibits 2 and 3 as her laboratory reports in this case. According to Zalekian, one substance contained 12.36 grams of heroin, and the other substance contained 25.84 grams of methamphetamine. Zalekian also testified that she did not test a third substance submitted to the lab, and she did not know what the substance contained.

10

<u>Testimony of Corporal Jason Boughter</u>

Corporal Jason Boughter testified that he is a main shift supervisor for the Jersey Village Police Department. Boughter recalled that on or about September 27, 2016, he made a traffic stop of a silver Jaguar at a Motel 6 on US Highway 290 westbound in the early morning hours. Boughter testified that the Jaguar had been driving with the high beams on. Boughter described the Motel 6 as "a hub" for the use and sale of methamphetamine and other drugs. Boughter testified that he saw the driver, who was later identified as Harmon, make a "furtive movement" and reach across the vehicle with his right hand, which Boughter associated with reaching for a weapon or moving contraband. Boughter recalled that Harmon was extremely nervous and breathing heavily, and he appeared to be under the influence of amphetamine. Dispatch advised Boughter that Harmon had an outstanding felony warrant for his arrest for failure to appear in Waller County. After a backup officer arrived, Boughter had Harmon get out of the car, detained him in handcuffs, and patted him down for weapons. Boughter found a "fat stack" of $20 bills in Harmon's pants pocket, and upon discovery of small fragments of marijuana found in the vehicle, Boughter determined there was probable cause to search the vehicle. In searching the vehicle, Boughter found syringes, lidocaine, testosterone, human growth hormones, some pills, and a "large bag of crystal methamphetamine and another large bag of heroin in a black sock[.]" Boughter agreed that the quantity of

11

methamphetamine weighed 41.2 grams and the heroin weighed just over 18 grams. After field testing the heroin, Boughter took Harmon to the police station, where a K-9 alerted to the money, and Harmon was then taken to the Harris County jail.

Testimony of Corporal Luke Castillo

Corporal Luke Castillo testified that he supervises the K-9 unit of the Waller County Sheriff's Office and he was training to become a K-9 trainer. Castillo agreed that he was patrolling on March 10, 2017 and he conducted a traffic stop of Harmon after checking on a suspicious vehicle about 1:30 in the morning. Castillo testified that the vehicle was suspicious because it was parked in front of a closed business in an area where there had been burglaries. Castillo recalled that Harmon and a woman were in the vehicle, and they were "kind of fidgety" and nervous, did not make eye contact, and did not answer his questions directly. Harmon declined Castillo's request to search the vehicle, a K-9 deputy arrived at the scene, and the dog gave a positive alert on the vehicle. Upon searching the vehicle, Castillo found 15.7 grams of methamphetamine, 6.4 grams of heroin, and pills. Castillo identified the defendant as the person he stopped and arrested that night.

Standard of Review and Applicable Law

We review the trial court's ruling on a motion to disclose the identity of a confidential informant under Rule 508 for an abuse of discretion. *See Ford v. State*, 179 S.W.3d 203, 210 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd); *see also*

12

*Taylor v. State*, 604 S.W.2d 175, 178-79 (Tex. Crim. App. 1980). The trial court's ruling will not be disturbed unless it falls outside the zone of reasonable disagreement. *Ford*, 179 S.W.3d at 210.

Generally, the State has a privilege to withhold the identity of any person who provided information relating to or assisting in the investigation of a possible crime. *See* Tex. R. Evid. 508(a); *Ford*, 179 S.W.3d at 210. If it appears from the evidence in the case, or from some other showing by a party, that an informant may be able to give testimony necessary to a fair determination of a material issue on guilt or innocence, and the State invokes the privilege, the judge must give the State an opportunity to show in camera facts relevant to determining whether the informant can, in fact, supply such testimony. *See* Tex. R. Evid. 508(c)(2). The two-part exception in subsection (c)(3) allows the court to order disclosure if "information from an informer is relied on to establish the legality of the means by which evidence was obtained[]" and if "the court is not satisfied that the information was received from an informer reasonably believed to be reliable or credible." *See* Tex. R. Evid. 508(c)(3).

A defendant requesting disclosure under Rule 508(c)(2) has the threshold burden to demonstrate that the informant's identity must be disclosed. *Bodin v. State*, 807 S.W.2d 313, 318 (Tex. Crim. App. 1991). Before a court orders the identity of the informant to be revealed, the informant's potential testimony must be shown to

13

significantly aid the defendant, and mere conjecture about possible relevance is insufficient to meet the threshold burden. *Id.* A party seeking disclosure must make a plausible showing of how the informant's information may be important. *See Abdel-Sater v. State*, 852 S.W.2d 671, 674 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd). Only after a defendant makes a plausible showing is the trial court required to hold an in-camera hearing to determine whether disclosure is necessary. *Olivarez v. State*, 171 S.W.3d 283, 292 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

When it is shown that an informant was an eyewitness to an alleged offense, the informant can give testimony necessary to a fair determination of the issues of guilt or innocence. *Coleman v. State*, 577 S.W.3d 623, 636 (Tex. App.—Fort Worth 2019, no pet.); *Haggerty v. State*, 429 S.W.3d 1, 8 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). But if the information from the informant was used only to establish probable cause for a search warrant or if the informant "merely provided information that led police to investigate a potential offense" and "was neither a participant in the offense for which the accused was charged nor present when a search warrant was executed or an arrest was made," then the informant's identity "need not be disclosed because the testimony is not essential to a fair determination of guilt or innocence." *Coleman*, 577 S.W.3d at 636; *Haggerty*, 429 S.W.3d at 8.

Analysis

Appellant argues that the trial court denied him a right to a fair trial because the court did not wait for Agent Ward to appear at the Rule 508 hearing so that Appellant could attempt to make a plausible showing that the CI's information may be important to his defense.[1] According to Appellant, Agent Ward's testimony at a Rule 508 hearing could aid in Appellant's defense because "it is undisputed that no officer testified that they observed the Appellant in possession of the drugs."

In this case, the Appellant was required to make a threshold "plausible showing" of how the CI's information may be important in his defense. *See Bodin*, 807 S.W.2d at 318 (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)). Appellant argued to the court that the CI had information that Harmon dealt in ounce-size quantities of drugs and that he carried drugs in a black sock. However, testimony at trial established that law enforcement knew there was an open warrant for Harmon, they approached Harmon in an open area, and they did not search Harmon on the night the black sock was found. The black sock was found on the ground near a vehicle registered to Harmon and where Trooper Lopez had observed

---

[1] Appellant also argues that he was denied the effective assistance of counsel as a result of this alleged error. To the extent Appellant intended to present this issue for our review on appeal, we conclude that he waived the issue by a failure to brief it. *See* Tex. R. App. P. 38.1(i); *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000).

Harmon standing. The State argued that it would not be relying on the CI to establish guilt or innocence.

No evidence or testimony at trial suggests that information from the CI was relied on "to establish the legality of the means by which evidence was obtained[.]" *See* Tex. R. Evid. 508(c)(3)(A)(i). Not only was there an open warrant for Harmon's arrest, but the black sock was found on the ground, and the search of the vehicle was supported by an alert by a drug-sniffing K-9. *See Matthews v. State*, 431 S.W.3d 596, 603-04 (Tex. Crim. App. 2014) ("If the dog alerts, the presence of drugs is confirmed, and police may make a warrantless search [of the vehicle]."). Even if the CI had "provided information that led police to investigate a potential offense[,]" the CI "was neither a participant in the offense for which the accused was charged nor present when a search [] was executed or an arrest was made," and therefore the CI's identity "need not be disclosed because the testimony is not essential to a fair determination of guilt or innocence." *See Coleman*, 577 S.W.3d at 636; *Haggerty*, 429 S.W.3d at 8. We cannot say the trial court's ruling is outside the zone of reasonable disagreement or that the trial court abused its discretion by concluding that the defense did not meet the threshold test for disclosure of the CI's identity. *See* Tex. R. Evid. 508; *Ford*, 179 S.W.3d at 210; *Bodin*, 807 S.W.2d at 318.

16

We overrule Appellant's sole issue, and we affirm the judgment of the trial court.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on March 4, 2021
Opinion Delivered April 14, 2021
Do Not Publish

Before Golemon, C.J., Horton and Johnson, JJ.