

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00291-CR
No. 02-22-00292-CR
No. 02-22-00293-CR
No. 02-22-00294-CR

_____

CESAR MARTINEZ, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 4
Tarrant County, Texas
Trial Court Nos. 1666710D, 1666715D, 1666720D, 1666725D

---

Before Bassel, Womack, and Wallach, JJ.
Opinion by Justice Bassel

## OPINION

## I. Introduction

Officers may open a cell phone abandoned at a crime scene to view non-electronic identifying information, such as the phone's international mobile equipment identification (IMEI) number, and then use that identifying information to obtain a search warrant for the phone's digital data. *See, e.g.*, *Ward v. Lee*, No. 19-CV-03986 (KAM), 2020 WL 6784195, at *8 (E.D.N.Y. Nov. 18, 2020) (mem. & order); *United States v. Pacheco*, No. 11-CR-121-A, 2015 WL 3402832, at *6 (W.D.N.Y. May 27, 2015) (decision & order).

Police linked Appellant Cesar Martinez to an abandoned cell phone after obtaining the phone's IMEI number and then using it to apply for a search warrant of the phone's digital data. The phone's digital data, in addition to other evidence, led to Martinez's convictions by a jury in four cases of aggravated robbery,[1] as well as—in one of the four cases—burglary of a habitation with intent to commit robbery and

---

[1]Martinez was charged with, on or about October 18, 2020, intentionally or knowingly, while in the course of committing theft of property and with intent to obtain or maintain control of said property, threatening or placing Robert Quintero (trial court cause number 1666710D; appellate court cause number 02-22-00291-CR), Jesus Flores (trial court cause number 1666720D; appellate court cause number 02-22-00293-CR), and David Sanchez (trial court cause number 1666725D; appellate court cause number 02-22-00294-CR) in fear of imminent bodily injury or death while using or exhibiting a deadly weapon (a firearm), and causing bodily injury to Rene Flores by striking him with a firearm (trial court cause number 1666715D; appellate court cause number 02-22-00292-CR). *See* Tex. Penal Code Ann. § 29.03(a)–(b).

Because Jesus and Rene, who are cousins, share the same last name, we will refer to each complainant by his first name to avoid confusion.

impersonating a public servant.[2]  The jury assessed Martinez's punishment at forty-five years' confinement for each aggravated-robbery conviction and for the burglary conviction, *see* Tex. Penal Code Ann. § 12.32 (first-degree-felony punishment), and ten years' confinement for the impersonation offense, *see id.* § 12.34 (third-degree-felony punishment).  The trial court ordered the sentences to run concurrently.

In three points, Martinez argues that the trial court erred by failing to suppress the evidence from the cell-phone search and by failing to suppress an impermissibly suggestive photo lineup and that these failures harmed him.  We disagree.  Because the trial court did not err by denying Martinez's motion to suppress the cell-phone evidence and because the cell-phone evidence and other evidence at trial unrelated to the photo lineup revealed Martinez's identity, even assuming that the trial court should have suppressed the photo lineup, Martinez was not harmed by its failure to do so.  *See* Tex. R. App. P. 44.2.  Accordingly, we affirm the trial court's judgments.

## II.  Background

### A.  The criminal episode

On October 17, 2020, housemates Roberto, Jesus, David, and Rene enjoyed a barbecue together after work.  Around 2:30 a.m., after Roberto, Rene, and David had gone to bed, Jesus was in the living room watching TV when a black-clad man and

---

[2]In Rene's case, Martinez was charged with committing burglary of a habitation (the home shared by the four complainants) and impersonating a public servant (a police officer).  *See* Tex. Penal Code Ann. §§ 30.02(a), (d), 37.11; *see also id.* § 3.02(a) (stating that a defendant may be prosecuted in a single criminal action for all offenses arising out of the same criminal episode).

woman, wearing masks and fake badges and bearing a fake deportation order, knocked on the front door, claimed to be police officers, demanded entry into the house, and—once inside—zip-tied all four men. Jesus and Roberto saw a gun at the male intruder's waist when he entered the house; Jesus testified that the female intruder was also armed.

The occupants quickly realized that the intruders were not police officers, and Jesus and Rene ripped through the poor-quality zip ties. Jesus shoved the masked man into a television, breaking it, and Jesus and Roberto followed the woman, who had gone into a bedroom. During the time it took for them to break open the bedroom door, the woman stole money and other items and then escaped by breaking a window. Roberto and Jesus attempted to pursue her but were unsuccessful.

When they returned to the house, David was heading outside with his cell phone to call the police, and Rene was still inside, fighting with the man, whose mask was removed during the struggle. In addition to losing his mask, the man also dropped his fake badge; the fake deportation order; a balaclava, which a witness described as "a thing that you wear over your head, and you can only see their eyes"; a baseball cap; and a cell phone—all of which the police later collected at the scene.

The fight ended when the man hit Rene in the head with the gun, dropping Rene to the ground. Rene testified that after he fell, the man pointed the gun at him, and he thought the man was going to shoot him. Rene closed his eyes, and when he opened them, the man was gone.

Roberto and Jesus were on their way to help Rene when the man, still holding the gun, left the house. Roberto testified that the man pointed the gun at him and told him to move aside. Jesus was behind Roberto, and he saw the man's face for a few seconds before the man took off running. When the police arrived,[3] Rene directed them to the cell phone dropped by the male assailant.

Over Martinez's running objection, Rene testified that he identified Martinez from the photo lineup and at trial but said that he was only 80% sure in both cases of his identification because of a facial hair difference[4] and the fact that Martinez's hair was longer at trial but had been short, a "buzz cut," on the night of the robbery.

**B. Suppression testimony and related evidence**

Martinez moved to suppress "all evidence resulting from the illegal search of [the] cell phone" that the police seized at the crime scene on October 18, 2020, as well as all physical evidence and testimony relating to that search or obtained as a result of information gained from the search. Evidence found on the cell phone included the identification of Martinez as its owner, his selfie,[5] an image of a fake search warrant

---

[3]The police were called at around 2:39 a.m.

[4]Outside the jury's presence, Jesus identified Martinez as the robber but said that he had not been able to identify him from a photo lineup because of a difference in Martinez's facial hair. The trial court sustained Martinez's objection to Jesus's identification.

[5]A selfie is a self-portrait photograph. *See Morgan v. State*, No. 07-22-00300-CR, 2023 WL 6976919, at *1 (Tex. App.—Amarillo Oct. 23, 2023, pet. ref'd) (mem. op., not designated for publication); *see also selfie*, https://www.merriam-

5

created on October 12, 2020; information on how to "make your own custom fake legal forms" accessed on October 15, 2020; an image of a fake deportation order like the one found at the scene but dated October 15, 2020, instead of October 17, 2020; a poorly aligned photograph of a broken television from October 18, 2020; and notes about police report #200032024, dated April 24, 2020.[6]

At the suppression hearing,[7] Fort Worth Police Detective Elias Reyes testified that he had written the search warrant for the cell phone and, when asked to briefly describe the circumstances under which the police seized the phone, he testified, "[T]he victims for this offense said the suspect's phone fell out of his pocket, and none of the victims claimed the phone. They said it was the suspect's phone,

---

webster.com/dictionary/selfie (last visited Apr. 2, 2024) ("an image that includes oneself . . . and is taken of oneself using a digital camera especially for posting on social networks").

[6]During trial, a police officer testified about an April 24, 2020 car accident involving Martinez and another driver, memorialized in report #200032024, and his body-camera footage from that day showed Martinez making notes about the report on a cell phone.

[7]Martinez also moved to suppress his in-court identification "due to impermissibly suggestive pre-trial identification procedures" that would give rise "to a substantial likelihood of misidentification of [him] at trial," and the trial court heard both suppression motions before trial. Because we conclude below that the trial court did not err by denying suppression of the cell-phone evidence, which directly tied Martinez to the offense and contained his selfie—allowing the jury to identify him from his selfie and his trial appearance without reference to the photo lineup or testimony about it—any error by denying the photo lineup suppression motion was harmless.

abandoned in the house."[8]  He took the phone to his office and kept it charged.  He

used a SIM[9] tool, like a paperclip, to access the cell phone's SIM tray so that he could

obtain the cell phone's IMEI number, which is a cell phone's unique serial number.

He used the IMEI number to identify the phone with particularity[10] in his warrant

application.[11]  He did not have to access—and did not access—the cell phone's

software to obtain the IMEI number.

---

[8]Before Detective Reyes arrived, another police officer had put the phone into "airplane mode."  Airplane mode "is where it takes the phone off the cellular network" to prevent someone from erasing the phone from a remote location.

[9]SIM is an acronym for subscriber identity module.  *State v. Moore*, 839 S.E.2d 882, 885 (S.C. 2020).

[10]The Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  The Fourth Amendment's "particularity requirement" assures the individual whose property is searched of the lawful authority of the executing officer, his need to search, and the limits of his powers to search.  *Bonds v. State*, 403 S.W.3d 867, 874 (Tex. Crim. App. 2013).  Among other things, one of the constitutional objectives of requiring a "particular" description includes minimizing the danger of mistakenly searching the property of an innocent bystander or property owner.  *Id.* at 874–75.

[11]*See United States v. Wells*, No. 20 CR. 633 (NRB), 2023 WL 2223474, at *8 (S.D.N.Y. Feb. 23, 2023) (mem. & order) ("Indeed, based on case law in the Circuit, law[-]enforcement officers appear to commonly list cell phones' IMEI numbers on their corresponding search warrant applications."); *see also Harmel v. State*, 597 S.W.3d 943, 963 (Tex. App.—Austin 2020, no pet.) (noting that the warrant described the phone by its make, model, serial number, and IMEI number and these descriptors—combined with accurate descriptions of the phone's location, owner, and color—permitted law-enforcement officers to reasonably locate the phone to be searched and to distinguish it from others); *Farek v. State*, No. 01-18-00385-CR, 2019 WL 2588106, at *8 (Tex. App.—Houston [1st Dist.] June 25, 2019, pet. ref'd) (mem. op., not designated for publication) (noting that search warrant's supporting affidavit

7

On cross-examination, Detective Reyes agreed that he had removed the cell phone's cover before inserting the SIM tool. He contended that he could enter the physical part of the cell phone before getting a warrant because the cell phone had been abandoned. He conceded that to obtain the search warrant, he was not required to have the IMEI number and that he could have removed the phone from its case, photographed it, and included the photograph in the warrant application. He agreed that there was no life-threatening situation requiring him to open the cell phone and that no one had reported to him that it had been stolen. His only information about the cell phone had come from the complainants, who indicated that their assailant had dropped it. Detective Reyes stated that he, personally, did not know if the phone had been lost and did not know any of the phone's "backstory" other than what he had been told by the complainants and other officers.

During his redirect examination, Detective Reyes contended that there was no other way—besides the IMEI number—to distinguish the cell phone from other cell phones of the same make, model, and color and that he needed the IMEI number because obtaining the phone's serial number would have required him to search into the phone's digital data. During recross-examination, Detective Reyes agreed that he could have waited until he had a warrant before he physically entered the phone

described phone as a "blue in color, Microsoft Lumia (Cricket) phone, Model # RM-1073, IME[I] #357815061300596 located at the Lake Jackson Police Department Evidence Room, located at 5 Oak Dr., Lake Jackson, Brazoria County, Texas").

8

because he had a photograph of it, because he had tagged it into evidence, and because it was not going anywhere.

At the hearing's conclusion, Martinez argued that his right to be free of unlawful searches and seizures had been violated when the police had physically entered his phone to obtain the IMEI number and that no exception under Code of Criminal Procedure Article 18.0215 applied.[12] The prosecutor countered that Martinez had no property interest or an insufficient property interest in the phone's IMEI number for standing to bring his suppression motion because he had abandoned the phone at the crime scene and because there was no other way to distinguish the phone from other cell phones.

---

[12]On appeal, neither party mentions Article 18.0215, which provides that a peace officer "may not search a person's cellular telephone . . . pursuant to a lawful arrest of the person without obtaining a warrant under this article." Tex. Code Crim. Proc. Ann. art. 18.0215(a). Under Article 18.0215, the phone's owner or possessor may consent to the search, and no warrant is required if the phone is reported stolen by its owner or possessor or if the officer reasonably believes that the phone is in the possession of a fugitive from justice for whom a felony-arrest warrant has been issued or there exists an immediate life-threatening situation. *Id.* art. 18.0215(d).

The statutory language makes clear that the scenario envisioned by the legislature is that the warrant requirement applies to a search of a person's cell phone in the search-incident-to-arrest scenario contemplated in *Riley v. California*, 573 U.S. 373, 134 S. Ct. 2473 (2014), discussed below. *See State v. Baldwin*, 664 S.W.3d 122, 131 (Tex. Crim. App. 2022) ("Under Texas law, to search a person's cell phone *after a lawful arrest*, a peace officer must submit an application for a warrant to a magistrate." (emphasis added)), *cert. denied*, 143 S. Ct. 777 (2023); *Harmel*, 597 S.W.3d at 963 ("[W]hen the State seeks to search a cellphone *pursuant to a lawful arrest*, it must obtain a warrant that, among other things, identifies the cell[ ]phone to be searched and states the name of its owner or possessor." (emphasis added)). That is not the case before us as the phone was not searched incident to Martinez's arrest.

9

The trial court denied the motion after observing,

> I don't know that somebody has a right to privacy in the IMEI number of their phone -- it's similar, I think, to a VIN number of a car, it's just a unique identifier -- and certainly not in a piece of property abandoned at a crime scene, allegedly, per what the police had[,] by the suspect of the offense.

During trial, Martinez's defense counsel renewed his suppression objections, and the trial court overruled them again and admitted the cell-phone evidence.[13] Detective Reyes testified that one of the responding police officers told him that one of the complainants had said that the cell phone had fallen out of the robber's pocket. Detective Reyes used the data from the phone and all the other evidence he had collected—including the photo lineup identification by Rene[14]—to write an arrest warrant for Martinez on December 3, 2020.

Arlington Police Officer James May testified that later that day—December 3, 2020—his patrol car's computer hit on a license plate with a warrant. He followed

---

[13]In determining whether a trial court's suppression decision is supported by the record, we generally consider only evidence adduced at the hearing because the ruling was based on it rather than on evidence introduced later. *See Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007); *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). But this general rule does not apply when the parties consensually relitigate the suppression issue during trial on the merits. *Gutierrez*, 221 S.W.3d at 687; *Rachal*, 917 S.W.2d at 809. If the State raised the issue at trial either without objection or with the defense's subsequent participation in the inquiry, the defendant is deemed to have elected to re-open the evidence, and we may consider the relevant trial testimony in our review. *Rachal*, 917 S.W.2d at 809.

[14]During Detective Reyes's cross-examination, defense counsel asked about photo lineup protocols and pointed out the differences between Martinez's attire and that of the five filler suspects as well as the shading differences in Martinez's photo from the other five photos.

the vehicle while waiting for backup for a felony stop because the warrant was for an aggravated robbery. He identified Martinez at trial as the vehicle's driver. Fort Worth police impounded the vehicle and searched it. Inside the vehicle, they found a fake badge identical to the one that had been abandoned at the October 18, 2020 crime scene and a purse containing Martinez's Tarrant County inmate ID photo.

### III. Suppression Analysis

In his second point, Martinez complains that the trial court erred by failing to suppress the cell-phone search results, and in part of his third point, he contends that the failure to suppress the results harmed him. Martinez argues that the police searched his phone without a warrant or exigent circumstances to obtain the IMEI number and then used that information to write the search warrant affidavit for the phone's digital contents. The State responds that Martinez abandoned the cell phone and that "opening the outer case of a phone left at the scene of a crime is akin to opening a folded wallet inadvertently left by a fleeing defendant following a bank robbery."

### A. Standard of review

The Fourth Amendment protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). A defendant seeking to suppress evidence on Fourth Amendment grounds bears the initial burden to produce some evidence that the government conducted a warrantless search or seizure that he has standing to contest.

11

*Rawlings v. Kentucky*, 448 U.S. 98, 104–05, 100 S. Ct. 2556, 2561 (1980); *State v. Martinez*, 569 S.W.3d 621, 623 (Tex. Crim. App. 2019). Once the defendant does so, the burden shifts to the State to prove either that the search or seizure was conducted pursuant to a warrant or, if warrantless, was otherwise reasonable. *Martinez*, 569 S.W.3d at 623.

## B. Cell-phone evidence

In 2014, the United States Supreme Court addressed the warrant requirement for cell-phone evidence in *Riley*, which consolidated two search-incident-to-arrest cases. *See* 573 U.S. at 378–81, 134 S. Ct. at 2480–82. The Court first described the term "cell phone" as a "misleading shorthand" for a device that is a minicomputer that can be used as a phone, camera, video player, rolodex, calendar, tape recorder, library, diary, album, television, map, or newspaper. *Id.* at 393, 134 S. Ct. at 2489. It observed that one of the most notable distinguishing features is the cell phone's immense storage capacity from which "[t]he sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions." *Id.* at 394, 134 S. Ct. at 2489.

The Court noted that while the "categorical" search-incident-to-arrest rule stated in *United States v. Robinson*, 414 U.S. 218, 94 S. Ct. 467 (1973), "strikes the appropriate balance in the context of physical objects," it did not have much force "with respect to digital content on cell phones" because the potential harm to officers and the destruction of evidence present in all custodial arrests do not apply to a

12

digital-data search. *Id.* at 386, 134 S. Ct. at 2484–85 ("A search of the information on a cell phone bears little resemblance to the type of brief physical search considered in *Robinson*."). That is, after an officer has secured a phone and eliminated any potential physical threats, the phone's data can endanger no one. *Id.* at 387, 134 S. Ct. at 2485.

The Court specifically declared, however, that "[l]aw enforcement officers remain free to examine the physical aspects of a phone to ensure that it will not be used as a weapon—say, to determine whether there is a razor blade hidden between the phone and its case." *Id.*, 134 S. Ct. at 2485. Thus, a physical search, rather than a digital search, *is* permitted incident to arrest. *Id.*, 134 S. Ct. at 2485. Law enforcement officers are also allowed to disconnect the phone from its cellular network to prevent remote wiping by turning it off, removing its battery, or placing the phone in an enclosure that isolates it from radio waves. *Id.* at 390, 134 S. Ct. at 2487.

Otherwise, however, a warrant is generally required before a cell-phone search: "Our answer to the question of what police must do before searching a cell phone seized incident to arrest is . . . simple—get a warrant." *Id.* at 401, 403, 134 S. Ct. at 2493, 2495. The Court also discussed other case-specific exceptions, such as exigency. *Id.* at 402, 134 S. Ct. at 2494; *see Akins v. State*, 573 S.W.3d 290, 296 (Tex. App.—Beaumont 2019, pet. ref'd) (distinguishing *Riley* because it "did not involve the issue of whether the defendant had abandoned the device that was searched").

Our Court of Criminal Appeals has also discussed the warrant requirement for cell-phone evidence. *See State v. Granville*, 423 S.W.3d 399, 402 (Tex. Crim. App. 2014)

13

(rejecting the prosecutor's argument "that a modern-day cell phone is like a pair of pants or a bag of groceries, for which a person loses all privacy protection once it is checked into a jail property room"). In *Granville*, the defendant—a high school student—was arrested for the Class C offense of causing a disturbance on a school bus, and his cell phone was taken from him during booking and placed into the jail property room. *Id.* Later that day, an officer investigating a different potential offense retrieved the cell phone and examined its contents without first requesting a warrant. *Id.* He turned on the phone and "went through it until he found the photograph he was looking for, . . . took the phone to his office, and printed a copy of the photograph." *Id.* The defendant was later charged with the state-jail felony offense of improper photography and sought to suppress the photograph based on his phone's illegal search. *Id.* The trial court granted his suppression motion, and the court of appeals affirmed, as did the Court of Criminal Appeals. *Id.* at 402, 417.

In reaching its conclusion that suppression was appropriate under the circumstances, the Court of Criminal Appeals observed that while a person may have a reasonable and legitimate expectation of privacy in his cell phone's contents, "he may lose that expectation under some circumstances, such as if he abandons his cell phone, lends it to others to use, or gives his consent to its search." *Id.* at 409 (internal footnotes omitted).[15] The court also noted that without violating the Fourth

[15]In its reference to abandonment, the court cited *United States v. Powell*, 732 F.3d 361, 374–75 (5th Cir. 2013), in which the defendant's denial of ownership of a

Amendment, "the officers could have reasonably inspected the outside of appellant's cell phone; they could have tested it for fingerprints or DNA material because portions of the cell phone are routinely exposed to the public." *Id.* at 416. That is, there is a significant distinction between the cell phone's exterior and its digital contents. *Id.*

## C. Non-digital intrusion

Some federal courts have indicated that merely checking for a serial number without intruding on digital data is not a Fourth Amendment violation. In *Ward*, like the instant case, the burglary defendant dropped his cell phone at the crime scene. 2020 WL 6784195, at *1 (noting that the defendant exited the home through a window and dropped both the cell phone and a screwdriver as he fled). The victim's husband told the officers at the scene that the cell phone discovered in his yard was not his. *Id.* at *2. The court first noted that the phone was abandoned at the crime scene, leaving the defendant with no reasonable expectation of privacy in the phone, and then that "the police did not search 'digital' content within the cell phone[] but rather checked the phone for its serial number, written in a space behind the battery pack." *Id.* at *8. The court concluded, "The law is clear that officers may legally open

---

cell phone eliminated her standing to suppress the evidence found on it, and *United States v. Lopez-Cruz*, 730 F.3d 803, 808–09 (9th Cir. 2013), in which the defendant retained standing because he made no affirmative denial of any association with the phone. *Granville*, 423 S.W.3d at 409 n.28; *see Akins*, 573 S.W.3d at 296 (citing *Granville* for the proposition that a person loses a reasonable expectation of privacy in a cell phone if he abandons the phone).

the battery pack of a phone to view its serial number and that this does not constitute a Fourth Amendment violation." *Id.* (referencing, among other cases, *United States v. Crumble*, 878 F.3d 656, 660 (8th Cir. 2018),[16] *United States v. Robinson*, No. 16-CR-545 (ADS) (AYS), 2019 WL 1211431, at *12 (E.D.N.Y. 2019) (report & recommendation),[17] *United States v. Quashie*, 162 F. Supp. 3d 135, 140 (E.D.N.Y. 2016),[18] *United States v. Vega-Cervantes*, No. 1:14-CR-234-WSD, 2015 WL 4877657, at

---

[16] In *Crumble*, the court held that the defendant had abandoned his cell phone inside a wrecked Buick after he fled the scene; he left the vehicle, with the key in the ignition, on a stranger's lawn, and he later denied any knowledge of the vehicle, showing his intent to abandon it and its contents. 878 F.3d at 659–60.

[17] In *Robinson*, the court denied a motion to suppress after concluding that the burglary suspect had abandoned the cell phone when he left it on the roof landing of the burgled second-floor apartment, near an open window, and then fled the scene. 2019 WL 1211431, at *5, *9–10, *14.

[18] In *Quashie*, a burglar dropped his cell phone in the victim's apartment. 162 F. Supp. 3d at 140. The victim found the cell phone and called the police. *Id.* The police "went into the telephone and obtained the number without obtaining a warrant," and, using this number, the police determined that the phone belonged to the defendant. *Id.* The court noted, "If defendant's phone was simply abandoned by him at the apartment where the robbery occurred, he has clearly relinquished his expectation of privacy in the property." *Id.* at 141. The court observed, "By leaving the phone behind in the apartment, the robber did not protect [it] and did not evince an intent to maintain an expectation of privacy in it." *Id.* The court concluded, "[T]he phone was abandoned when it was left in the victim's apartment. Once the property was abandoned, officers were free to do the limited search of the phone." *Id.* The court held that *Riley* did not apply because it "outlines the standard to be applied to a search of a cell[ ]phone incident to arrest" and "has nothing to do with an abandoned cell[ ]phone." *Id.* at 141–42.

16

*16 (N.D. Ga. Aug. 13, 2015) (op. & order),[19] and *Pacheco*, 2015 WL 3402832, at *6;[20]

*see United States v. Andrade*, No. 18-145-JJM-LDA, 2022 WL 179341, at *3 (D.R.I. Jan. 20, 2022) (order) (holding that the defendant's challenge to the removal of the cell phone's back cover to find its serial number and to apply for a search warrant was not an illegal warrantless search "because law enforcement already legally had the device[] following the inventory search and [because] the law does not require a warrant when

---

[19]In *Vega-Cervantes*, an investigator removed the battery from the defendant's seized cell phone to view identifying information behind the battery, turned the phone on, and went into "memory" to identify the phone's serial number and telephone number. 2015 WL 4877657, at *6. He did not look into the call log, contact list, or text messages before obtaining a search warrant. *Id.* The court stated that the "minimally intrusive examination d[id] not implicate the privacy interests at issue in *Riley* and was reasonable under the circumstances." *Id.* at *15.

[20]In *Pacheco*, after investigators seized twelve cell phones during a warrant-based search of the defendant's residence, one of the investigators secured the phones' identifying numbers to include in the search warrant application. 2015 WL 3402832, at *3–4. For three of the phones, he had to remove the back plate and the batteries to look for unique identifying numbers. *Id.* at *4. The court noted that nothing in the record indicated that the agents had conducted a search for digital data before obtaining a search warrant. *Id.* at *6. Then, as to the Supreme Court's statement in *Riley* about removing a phone's battery to prevent the remote wiping, the court stated,

> [I]f the officers can legally enter the phone without a search warrant and remove the battery so as to disconnect it from the network, they can legally enter the phone without a search warrant and remove the battery so as to view hard copy phone identification numbers which do not constitute "digital data" contained within the phone.

*Id.* Doing so, "at best" constituted a "minimal intrusion that d[id] not rise to the level of a Fourth Amendment violation." *Id.* at *7 ("The purpose in seeking this information was to provide [the investigator] with information that could be used as descriptive identifiers in his later application for a search warrant that would authorize a search of those phones for 'digital content' or digital data.").

17

'police did not search digital content within the phone[] but rather checked the phone for its serial number, written in a space behind the battery pack'" (quoting *Ward*, 2020 WL 36784195, at *8)).

Likewise, at least one state supreme court has determined that a limited search of a SIM card to establish ownership is wholly distinct from examining a phone's contents. *Moore*, 839 S.E.2d at 886. A SIM card is "a small device [that] contains a customer's basic information, along with encryption data to allow a device to access a particular carrier's mobile network" and does not contain most of the information available on an unlocked cell phone, thus diminishing the privacy implications identified in *Riley*. *Id.* at 886–87. In *Moore*, the defendant left his flip phone at a crime scene, and in the investigation that followed, officers removed the phone's SIM card to determine ownership and then obtained a warrant to search the phone's contents. *Id.* at 885.

The court held that under these circumstances, the limited search of the SIM card for purposes of identification was reasonable and did not contravene the Fourth Amendment. *Id.* at 888. The court stated, "To the extent [the defendant] retained an expectation of privacy in his cell phone left next to the victim's body, that expectation of privacy was diminished to the point that the finder could properly examine the item in a manner limited to determining the owner." *Id.*; *see Oseguera-Viera v. State*, 592 S.W.3d 960, 965–66 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd) (holding grocery store employee-defendant's objective expectation of privacy in his mislaid cell

18

phone containing child pornography was limited by the police officer's ability to access the unlocked and not-password-protected cell phone—once a customer had turned it in—to determine ownership and noting that the court was not deciding "the extent to which an officer may review the contents of a cell phone to determine its owner"); *see also United States v. Nealis*, 180 F. Supp. 3d 944, 950 (N.D. Okla. 2016) (op. & order) (noting that "[w]hen an individual loses or mislays personal property, his or her 'expectation of privacy is diminished to the extent that the finder may examine and search the lost property to determine its owner.'"); *State v. Hill*, 789 S.E.2d 317, 317–18 (Ga. Ct. App. 2016) (holding that defendant, who left his cell phone in the back of a taxi before skipping out on the fare, had no reasonable expectation of privacy in his name, date of birth, and phone number, which an investigating officer obtained by calling 911 from the phone); *State v. Green*, 164 So. 3d 331, 344 (La. Ct. App. 2015) (holding that officer's removal of the back of defendant's cell phone to obtain the serial number and other identifying information was not a "search" within the Fourth Amendment's meaning).

## D.  Abandonment

Even if opening a phone to obtain the IMEI number could have been an otherwise improper search, Martinez still had to prove that he had a reasonable expectation of privacy in the phone at the time of the contested search to establish standing to bring his suppression motion.  *See King v. State*, 670 S.W.3d 653, 657 (Tex.

Crim. App.), *cert. denied*, 144 S. Ct. 386 (2023);[21] *see also Wiltz v. State*, 595 S.W.3d 930, 934 (Tex. App.—Houston [14th Dist.]) ("[O]ne may lose a reasonable and legitimate expectation of privacy in the contents of one's cell phone if one abandons the phone."), *pet. ref'd*, 609 S.W.3d 543 (Tex. Crim. App. 2020).

When a defendant voluntarily abandons property, he lacks standing to contest the reasonableness of the search of the abandoned property. *McCurley v. State*, 653 S.W.3d 477, 490–91 (Tex. App.—Fort Worth 2022, pet. ref'd) (holding that defendant had no reasonable expectation of privacy in the DNA profile developed from his abandoned trash); *see United States v. Hooper*, 482 F. Supp. 3d 496, 509 (E.D. Va. 2020) ("[T]here can be nothing unlawful in the Government's appropriation of . . . abandoned property."), *aff'd*, No. 21-4220, 2022 WL 1184181 (4th Cir. Apr. 21, 2022) (per curiam) (not designated for publication), *cert. denied*, 143 S. Ct. 259 (2022).[22]

---

[21]*King* involved standing to challenge a search related to a cell phone, but not in the context of a defendant's having dropped the phone at a crime scene. Instead, after the defendant was arrested, his employer's tractor-trailer (where the defendant lived) was searched pursuant to a warrant. 670 S.W.3d at 658. The tractor-trailer was returned to his employer, who subsequently sent the defendant's phone to the police when the police realized that they had inadvertently failed to collect it during the search. *Id.* The phone was searched under a separate warrant, and the defendant did not contest that search. *Id.* The court held that the defendant had failed to establish his own privacy interest in the tractor-trailer when the cell phone was seized (i.e., after his arrest and the tractor-trailer's return to his employer) and that he therefore lacked standing to bring his Fourth Amendment suppression claim. *Id.* at 658–59.

[22]In *Hooper*, the defendant's acts provided the inference that he had abandoned his phone. 482 F. Supp. 3d at 510. He left his phone outside on an oyster-culling table on a pier that he did not own and where he had no reasonable expectation of privacy. *Id.* He did not attempt to shield the phone from other employees or the

20

Property is abandoned if (1) the defendant intended to abandon the property and (2) his decision to abandon the property was not due to police misconduct.[23] *McCurley*, 653 S.W.3d at 490 (citing *Swearingen v. State*, 101 S.W.3d 89, 101 (Tex. Crim. App. 2003)).

Abandonment is primarily a question of intent. *McDuff v. State*, 939 S.W.2d 607, 616 (Tex. Crim. App. 1997). Intent to abandon may be inferred "from words spoken, acts done, and other objective facts and relevant circumstances." *Id.* The issue is not abandonment in the "strict property-right sense[] but rather whether the accused ha[s] voluntarily discarded, left behind, or otherwise relinquished his interest in the property so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." *Id.*; *see Matthews v. State*, 431 S.W.3d 596,

---

public on the river who might pass by it, and he made no effort to shield it from the elements, thereby risking its destruction. *Id.* Other people's later efforts to shield the phone from theft and the elements after the defendant had left it had no effect on the court's analysis because "the inquiry turn[ed] on [the] [d]efendant's intent at the time that he walked away from the table." *Id.* The defendant ran the risk that strangers would find the phone when he left it on the table on someone else's pier in the public river, and "[t]he fact that strangers could so readily access his phone gives rise to an inference of abandonment." *Id.*

[23]No seizure occurs under the Fourth Amendment when police take possession of property that has been abandoned without police misconduct. *McCurley*, 653 S.W.3d at 490. Misconduct, in relation to the concept of abandonment, contemplates illegal activity directly related to the search and seizure. *Kelso v. State*, 562 S.W.3d 120, 130 (Tex. App.—Texarkana 2018, pet. ref'd) (noting that any police misconduct that occurred after the cell phone was abandoned could not have directly caused its abandonment). No one raised police misconduct at the suppression hearing, and the record does not reflect any police misconduct in that the police arrived at the scene after Martinez had already fled.

609–10 (Tex. Crim. App. 2014) (holding that the appellant intended to abandon any expectation of privacy in the van he left behind when, while being detained, he took off running and left the keys in the vehicle's ignition); *cf. State v. Dixon*, No. 13-09-00445-CR, 2010 WL 3419231, at \*7 (Tex. App.—Corpus Christi–Edinburg Aug. 27, 2010, pet. ref'd) (mem. op., not designated for publication) (stating that the cell phone was not abandoned when it was preceded by an unlawful act—theft of the phone—by a third person, who later provided the phone to the police).

At least one court—the Fourth Circuit—has stated that abandonment of a phone should not be "casually inferred" because people lose or misplace their cell phones all the time and that the simple loss of a cell phone does not entail the loss of a reasonable expectation of privacy. *United States v. Small*, 944 F.3d 490, 503 (4th Cir. 2019). In *Small*, officers found a cell phone as they searched for the defendant, who had fled from the police in a stolen vehicle. *Id.* at 496. One of the investigators observed that the phone was receiving calls from someone identified on its screen as "Sincere my Wife." *Id.* Without obtaining a warrant, the investigator used the phone to call "Sincere" back. *Id.* Sincere informed the investigator that the phone belonged to her husband. *Id.* Police obtained a photo of him; found that it matched security footage captured during the defendant's flight from the police; and from this evidence, concluded that Sincere's husband was the stolen vehicle's driver. *Id.* Officers used the phone three more times without obtaining a warrant—first to call Sincere to see if the defendant had returned home (he had not); next to answer

22

Sincere's call, at which point they informed her that the police were looking for him; and then to remove the phone's back casing and battery to locate its serial number and other identifying information. *Id.*

The defendant argued that the four warrantless searches of his phone violated the Fourth Amendment. *Id.* at 498. The district court concluded that no warrant was required because he had abandoned his phone. *Id.* The Fourth Circuit affirmed, noting that an abandonment finding is based not on whether all formal property rights have been relinquished but on whether the complaining party retains a reasonable expectation of privacy in the articles alleged to have been abandoned based on the defendant's actions and intentions. *Id.* at 502, 505. Specifically, it noted that the defendant had tossed aside other personal items—a shirt and a hat, located fifty yards from the phone—while fleeing to evade capture and abandoning his vehicle. *Id.* at 503. The court concluded that based on these circumstances, the district court's inference of abandonment seemed sensible because a cell phone's GPS tracking can "lead you to a defendant," making it credible that a fleeing suspect might intentionally discard his phone. *Id.* The court also noted that while phones occasionally slip out of pockets, shirts do not accidentally fall off their wearers at the same moment as hats and that cars do not ditch themselves after a crash. *Id.* "The fleeing suspect's relinquishment of the car, the hat, and the shirt near where the cell phone was found support[ed] the district court's finding of abandonment." *Id.*

Some of our sister courts have stated that when a defendant leaves his cell phone at a place where he had no right to be, he loses any legitimate expectation of privacy in that phone. *See Martinez v. State*, No. 08-14-00130-CR, 2016 WL 4447660, at *4 (Tex. App.—El Paso Aug. 24, 2016, pet. ref'd) (mem. op., not designated for publication) (stating that the appellant had no expectation of privacy in a cell phone that he left at a murder scene);[24] *Edwards v. State*, 497 S.W.3d 147, 161 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (holding that the appellant had abandoned his cell phone at the scene of the robbery when he left the phone on top of the vehicle in which he had ridden to the scene and then had fled on foot); *Royston v. State*, No. 14-13-00920-CR, 2015 WL 3799698, at *4 (Tex. App.—Houston [14th Dist.] June 18, 2015, pet. ref'd) (mem. op., not designated for publication) (holding that the appellant had abandoned his phone by "surreptitiously" placing it in a public dressing room on record mode and then walking away from not only the phone but also the store).

Making no attempt to recover a phone dropped at a crime scene may signal abandonment. *See State v. Brown*, 815 S.E.2d 761, 764-65 (S.C. 2018).[25] In *Brown*, a burglar broke into the victims' home while they were away and dropped his cell phone

---

[24]In *Martinez*, when the police found the bloody cell phone in the victims' master bedroom, the police did not know to whom it belonged. 2016 WL 4447660, at *3. They initiated a call from the phone to a detective's phone, and caller ID gave them information leading to the appellant's identity. *Id.* Upon learning the appellant's identity, they took no further steps to peruse the phone's contents. *Id.* at *4.

[25]Although *Brown*'s specific issue focuses on digital information, the abandonment discussion is nonetheless helpful.

by the window that he had broken to gain entry. *Id.* at 762. The police took the phone and secured it in the evidence room. *Id.* Six days later, an officer retrieved the phone; guessed the code to unlock the screen; looked through the "contacts"; found a person listed as "Grandma"; and entered her number into a database that identified a list of her relatives, including a man matching the age of the person on the phone's background screen (the defendant). *Id.* at 762–63. After identifying the defendant, the police took the phone to his home and told him that it had been found at a burglary scene. *Id.* at 763. The defendant admitted that it was his phone but claimed that he had lost it a day after the burglary. *Id.* He was charged with burglary, and the trial court found that he had no reasonable expectation of privacy in the phone's digital information because he had abandoned the phone. *Id.*

The court noted that—at least until the time of the burglary—the defendant had enjoyed Fourth Amendment protection for his phone's digital information because he had put a lock on the phone's screen. *Id.* at 764. The court also presumed that he did not intentionally leave his cell phone at the crime scene because "he must have known that doing so would lead to the discovery that he was the burglar." *Id.* But then the phone sat in the evidence locker at the police station for six days, and the record did not reflect that the defendant did anything during that time to try to recover his phone: there was no evidence that he tried to call or text the phone to see if someone would answer or that he attempted to contact his phone's service provider

25

for information on the phone's whereabouts. *Id.* at 764–65. Instead, he contacted his service provider and cancelled his phone's cellular service. *Id.* at 765.

The court observed that the defendant had "put himself in the difficult position of having to balance the risk that finding the phone would incriminate him against the benefit of retrieving the private digital information stored in it." *Id.* The court stated, "Looking at these facts objectively, any police officer would assume after six days of no efforts by the owner to recover this phone—especially under the circumstance that the owner left the phone at the scene of a burglary—that the owner had decided it was too risky to try to recover it." *Id.* The court reiterated,

> The idea that a burglar may leave his cell phone at the scene of his crime, do nothing to recover the phone for six days, cancel cellular service to the phone, and then expect that law enforcement officers will not attempt to access the contents of the phone to determine who committed the burglary is not an idea that society will accept as reasonable.

*Id.* at 765–66. The defendant's decision not to attempt to recover the phone equated to the phone's abandonment. *Id.* at 765.

Flight also signals abandonment of an expectation of privacy. *Wiltz*, 595 S.W.3d at 935. In *Wiltz*, the appellant was handcuffed after a traffic stop. *Id.* Before he fled, he retained the privacy protections in his cell phone afforded by law. *Id.* But when he opted to flee the scene and leave his cell phone behind, he "intentionally gave up any privacy rights to information on the cell phone." *Id.* (noting that *Riley* did

26

not address the abandonment doctrine or any standing issue and "explicitly left the door open for other case-specific exceptions").[26]

In another flight case, *United States v. Kamara*, the court held that the defendant had abandoned his phone when he abandoned the jacket that contained the phone. No. 1:23-CR-149 (RDA), 2023 WL 8357946, at *5 (E.D. Va. Dec. 1, 2023) (mem. op. & order). The defendant had worn a black puffer jacket during a shooting, and then after the police pursued his vehicle, an officer saw him drop a firearm and "remove and toss down his black jacket." *Id.* at *1. The defendant's iPhone was in the jacket, although the defendant claimed that he did not know that the phone was in his jacket pocket when he discarded the jacket. *Id.* The iPhone was not discovered until almost a month later because the police were engaged in processing other evidence. *Id.* at *2. When the police became aware of the phone, they obtained a search warrant for it. *Id.*

Body-camera footage showed that the defendant had been fleeing law enforcement on foot when he "actively discarded the puffer jacket he was wearing, which was later found to contain fentanyl pills, over $500 in cash," and the phone. *Id.* at *5. The court noted that "[t]he implication here is significant and the same one

_____

[26]The Court of Criminal Appeals refused the defendant's petition for discretionary review in *Wiltz*. In a dissenting opinion to the refusal, Judge Walker pointed out that the court had not yet "determine[d] the parameters in which a person's actions constitute intentional abandonment of his cell phone for purposes of the Fourth Amendment" and opined that the court should have granted review. *Wiltz*, 609 S.W.3d at 543 (Walker, J., dissenting). He also noted "the distinction between the privacy interests of a cell phone as a physical object and the digital contents stored on a cell phone." *Id.* at 547.

drawn in *Small*: Defendant was attempting to get away from law enforcement and did not want to be linked to the pills [or] the information contained in the iPhone." *Id.* The court countered the defendant's argument that he did not know where his phone was on his person while he was being pursued by stating that such a theory "defies the logic of modern life." *Id.* The *Kamara* court noted that "cell phones 'are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy.'" *Id.* (quoting *Riley*, 573 U.S. at 385, 134 S. Ct. at 2484).

**E. Analysis**

Based on the above, the police did not have to obtain a warrant to obtain the phone's IMEI number from its interior SIM tray before securing a warrant to view the phone's digital contents. The IMEI number allowed the police to describe the phone with the particularity required to obtain the warrant, and to hold otherwise would impede the ability of police officers (and good Samaritans) to attempt to determine a cell phone's ownership by checking its nondigital identifiers. *See Riley*, 573 U.S. at 387, 390, 134 S. Ct. at 2485, 2487 (allowing for police to examine a phone's physical aspects and to remove its battery); *Ward*, 2020 WL 6784195, at *8 (stating that police may legally open a phone's battery pack to view its serial number without violating the Fourth Amendment); *Vega-Cervantes*, 2015 WL 4877657, at *15 (stating that removal of a phone's battery did not violate the defendant's Fourth Amendment rights); *Pacheco*, 2015 WL 3402832, at *6 (same); *Andrade*, 2022 WL

179341 at *3 (same); *Green*, 164 So.3d at 344 (same); *see also Moore*, 839 S.E.2d at 888 (allowing for diminished privacy expectation so that cell phone's finder could examine it to determine ownership); *Hill*, 789 S.E.2d at 317–18 (same).

Further, by fleeing, Martinez abandoned any reasonable expectation of privacy in the IMEI number when he dropped the phone at the crime scene—a place he had no right to be—along with his baseball cap, his fake badge, his fake deportation warrant, and his balaclava.[27] *See Granville*, 423 S.W.3d at 409 (noting that a person may abandon his reasonable expectation of privacy in his phone's contents by abandoning the phone); *Quashie*, 162 F. Supp. 3d at 141 (holding that suspect abandoned his phone when he dropped it and then left it behind); *Robinson*, 2019 WL 1211431, at *5, *9–10, *14 (same); *Martinez*, 2016 WL 4447660, at *4 (same); *see also Wiltz*, 595 S.W.3d at 934–36 (addressing cell-phone abandonment); *Small*, 944 F.3d at 503 (concluding that phone had been abandoned when defendant also abandoned other personal or incriminating items while fleeing); *Kamara*, 2023 WL 8357946, at *5 (same). Accordingly, we overrule Martinez's second point and the related portion of his third point.

---

[27]The record does not reflect whether Martinez attempted to contact the police to see if they had his phone or whether he attempted to cancel his cellular service. *See Brown*, 815 S.E.2d at 764–65. The record also does not reflect how long the police waited before applying for the search warrant. *Cf. id.* at 765.

## IV. Photo Lineup

Martinez's first point challenges the photo lineup. Assuming, without deciding, that the photo lineup was unduly suggestive and that the trial court erred by failing to suppress it, we conclude that any error was ultimately harmless. *See* Tex. R. App. P. 44.2(a) (explaining that for constitutional error, the court must reverse a judgment of conviction or punishment unless it determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment); *Tillman v. State*, 376 S.W.3d 188, 202 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (explaining that the constitutional-harm analysis should focus not on the propriety of the trial's outcome but rather on the probable impact on the jury in light of the existence of other evidence, with the record viewed in a neutral, impartial, and even-handed manner); *Hurd v. State*, Nos. 2-09-104-CR, 2-09-105-CR, 2-09-106-CR, 2-09-107-CR, 2010 WL 2636118, at *5 (Tex. App.—Fort Worth July 1, 2010, no pet.) (mem. op., not designated for publication) ("[W]e must determine whether there is a reasonable probability that the illegally obtained and wrongly admitted evidence []moved the jury from a state of non-persuasion to one of persuasion on a particular issue[].").

Overwhelming evidence tied Martinez to the offense, including his Tarrant County jail inmate ID photo that was found in his vehicle with a fake badge identical to the one used in the October 18, 2020 robbery and abandoned at the scene and testimony by Jesus, Rene, and Roberto about the offense itself, including about their television, which was broken during the robbery. Martinez's cell phone—abandoned

30

at the crime scene along with the fake badge and fake deportation order—contained all of the remaining evidence that the jury needed to find him guilty beyond a reasonable doubt: an image of a fake search warrant created six days before the robbery; searches on how to "make your own custom fake legal forms" from three days before the robbery; an image of a fake deportation order like the one found on the scene; a poorly aligned photo of a broken television taken on October 18, 2020; and Martinez's selfie, from which the jurors could compare both his trial appearance and his jail ID photo for themselves. *See Tillman*, 376 S.W.3d at 202 ("The presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error under Rule 44.2(a)."); *Hurd*, 2010 WL 2636118, at *6 (holding that witness's identification of the appellant did not likely materially affect the jury's deliberation in light of all of the other evidence linking the appellant to the offense and thus was harmless beyond a reasonable doubt). In light of the above, independently secured evidence of Martinez's identity as the robber and his guilt, Rene's in-court identification of him and evidence of Rene's identification of Martinez from the photo lineup—both at 80%—were harmless. We overrule Martinez's first point and the related portion of his third point.

## V. Conclusion

Having overruled Martinez's three points, we affirm the trial court's judgments.

/s/ Dabney Bassel

Dabney Bassel
Justice

Publish

Delivered:  April 11, 2024